# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES *ex rel.* | : | | |
| PCA INTEGRITY ASSOCIATES, LLP, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-750 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 77, 79, 81, 85, 86, |
| | : | | 87, 88, 89, 91, 92, |
| | : | | 93, 98 |
| NCO FINANCIAL SYSTEMS, INC., *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING JOINT MOTION TO DISMISS CLAIMS AGAINST DEFENDANT WEST CORPORATION; GRANTING DEFENDANTS' MOTIONS TO DISMISS; DENYING AS MOOT DEFENDANT CONSERVE'S MOTION FOR JUDICIAL NOTICE; DENYING AS MOOT RELATOR PCA INTEGRITY'S MOTION FOR JUDICIAL NOTICE

## I. INTRODUCTION

On May 20, 2015, Relator PCA Integrity Associates, LLP ("PCA Integrity" or "Relator")

filed this lawsuit pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. §

3730(b)(1). *See* Compl. ECF No. 1. Relator is a limited liability partnership that consists of

three unnamed partners with "personal knowledge of the false claims, statements, and

concealments alleged," Am. Compl. ¶ 7, ECF No. 54, based on participation in an unidentified

private collection agency ("PCA") "initiative working for certain PCAs" and Relator's

"independent investigation to uncover false claims," *id.* ¶ 29. The alleged false claims arise from

Defendants' conduct pursuant to a multi-year contract awarded by the Department of Education

("ED"). More specifically, PCA Integrity contends that three clusters of Defendants, consisting

of groups of prime contractors, subcontractors, and associated entities that it labels "co-

conspirator businesses," along with unnamed John Doe Defendants, defrauded the government

of funds that were intended for small businesses under the terms of ED task orders awarded to

PCA prime contractors.  After the government declined to intervene in this suit in October 2018,

Relator filed an amended complaint on March 28, 2019, in which it removed several defendants,

added two new allegedly affiliated businesses as defendants, and reasserted four counts under the

FCA for: (1) false presentation/false submission of a claim (31 U.S.C. § 3729(a)(1)(A)); (2) false

representation (31 U.S.C. § 3729(a)(1)(B)); (3) so-called "reverse" false claims (31 U.S.C. §

3729(a)(1)(G)); and (4) conspiracy to violate the FCA (U.S.C. § 3729(a)(1)(C)).  Each of the

current Defendants moved to dismiss Relator's claims. For the reasons set forth below, the Court

grants Defendants' motions, but gives Relator leave to file an amended complaint.[1]

## II.  BACKGROUND

### A.  Factual History[2]

1.  Regulatory Background

*a.  ED's Debt Collection Service Contracting*

This dispute arises from ED task orders issued to prime contractors as part of its debt-

collection and maintenance program.  *See* Am. Compl. ¶¶ 6, 9–13.  For nearly four decades, a

division of ED known as Federal Student Aid ("FSA") has relied on PCA contractors to collect

and resolve defaulted student loans.  *Id.* ¶ 6.  ED contractors must comply with applicable

Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 1 *et seq.*, and also with ED's Acquisition

Regulations, 48 C.F.R. §§ 3400 *et seq.  Id.* ¶ 47.  Within ED's FSA, the Debt Collection Service

---

[1] Although several Defendants request an oral hearing, the allowance of such hearings is "within the discretion of the Court."  LCvR 7(f).  Because the parties' written briefings are sufficient to resolve the instant motions, the Court declines to conduct oral hearings.

[2] At the motion to dismiss stage, the Court views the evidence in the light most favorable to Plaintiff.  *See United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000) ("At the motion to dismiss stage, the only relevant factual allegations are the plaintiffs', and they must be presumed to be true.").

("DCS") manages "collection activities, including PCA contractors." *Id.* ¶ 49. DCS is located in Washington, D.C. *Id.* Its Contract Services Branch, which "monitors the performance of the PCA contractors," is based in Atlanta, Georgia. *Id.* DCS contracts are issued via task orders, which serve as "ED's contract under the umbrella of the" General Services Administration's schedule contract, which permits "ED and other federal agencies . . . [to] place orders." *Id.* ¶ 50. These contractual task orders "contain terms, conditions and work requirements, which are defined in a Statement of Work." *Id.* Potential contractors submit proposals in response to ED solicitations. *See id.* ¶¶ 50–52 (discussing process by which "[o]ffers leading to contract awards" are evaluated). ED's contracting officers evaluate proposals based on factors that include past performance, small business participation, and pricing by "two separate panels: small business and unrestricted." *Id.* ¶ 51.

Once task orders are awarded, because ED PCA contracts are "performance based and highly competitive," they are subject to a rigorous "measurement and reward system designed to align" ED and PCA interests. *Id.* ¶ 53. The metric applied is the Competitive Performance and Continuous Surveillance ("CPCS") rankings. *Id.* CPSC scores matter to government contractors because the long-term scores "are used to determine past performance and award extensions," and the scores are also used to assess a particular PCA's performance relative to other PCAs and thereby allocate quarterly bonuses. *Id.* ¶¶ 54, 56. The CPCS score is measured out of 100 points, with 10 points allocated based on administrative resolutions, 20 points allocated based on total accounts serviced, and 70 points allocated based on dollars collected. *Id.* In addition, because the Small Business Act "encourages prime contractors to award subcontracts to small companies," certain ED PCA task orders—like the ones at issue in this suit—contain incentives for prime contractors to subcontract a percentage of their work to small business concerns. *Id.* ¶

7.  These incentives can take the form of additional points added to the prime contractor's CPCS ranking.  *Id.* ¶ 55.

Additionally, in furtherance of the government's efforts to help "ensure the continued vitality of small businesses," *id.* ¶ 2, ED offers small businesses the opportunity to either subcontract with existing ED PCA contractors or to contract directly via small business set aside contracts, *id.* ¶ 57.  Where subcontracting occurs, the subcontractor serves as a "vendor to ED PCA prime contractors to work on core collection services."  *Id.*

On May 29, 2008, ED issued the PCA solicitation on which this case is based: Solicitation No. ED-08-R-0052.  *Id.* ¶ 52.  Interested companies submitted proposals by June 26, 2008.  *Id.*  A total of twenty-two PCAs received ED contracts (e.g., task orders).  *Id.*  Of the PCAs receiving such task orders, seventeen were "unrestricted" in size, and five were small, or "set-aside" PCAs, *id.*, reflecting the government's efforts to provide "set-aside contracts . . . exclusively for small businesses to bid on," *id.* ¶ 2.[3]  While the task orders were active, ED provided incentives for prime contractors to subcontract "no less than 10% of their work to small business concerns" by adding a five-point bonus to the CPCS score of any such PCA.  *Id.* ¶ 55.  "The first transfer of accounts under this contract occurred in the first quarter of 2009," *id.* ¶ 52, and the task orders pertaining to unrestricted PCAs concluded in late April 2015, *id.* ¶ 60.  On an unspecified date, five PCAs received a two-year extension of the original task order, including, as relevant here, Defendant Continental Service Group.  *Id.*

Before the conclusion of the contracts that were issued in 2009, ED solicited and awarded additional task orders.  First, in July 2013, seeking to develop "task orders replacing both those awarded in 2009," ED published Solicitation No. ED-FSA-13-R-0010.  *Id.* ¶ 61.  This

_____
[3] Relator does not specify which of the PCA contractors received which form of task order resulting from the 2008 ED solicitation.

procurement was cancelled in 2018, "in part because [ED] had learned of" the "widespread small business fraud" alleged in this lawsuit. *Id.* ¶ 62. Separately, ED awarded new debt-collection task orders set aside specifically for small businesses in September 2014. *Id.* ¶ 59. Defendant "Co-Conspirator" Bass & Associates, P.C. was awarded one of these 2014 task orders. *Id.* Before describing the Defendants' identities in more detail, the Court will briefly summarize the relevant principles of federal small business contracting that underpin Relator's contentions.

### b. Small Business Act and Federal Contracting

The Small Business Act ("SBA") aims to provide small companies with "'the maximum practicable opportunity to participate in the performance' of federal contracts." *Id.* ¶ 63 (quoting 15 U.S.C. § 637(d)(1)). To ensure compliance with this objective, the SBA requires that—unless otherwise specified—language concerning the federal government's goal be included in every federal prime contract. *Id.* ¶ 64. Each federal prime contract must also include the following clause: "[t]he contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract." *Id.* (quoting 15 U.S.C. § 637(d)(3)).

Furthermore, to be eligible to receive a contract, each federal prime contractor who meets a threshold dollar amount must submit additional materials to the government. *Id.* ¶ 69 (citing 15 U.S.C. § 637(d)(4)(C); 49 C.F.R. § 19.702). Such prime contractors must submit a subcontracting plan to the relevant contracting agency that (1) states the prime contractor's "percentage goals for the utilization" of small businesses, *id.* ¶ 65 (quoting 15 U.S.C. § 637(d)(4), (d)(6)), and (2) states "the total dollars planned to be subcontracted and a statement of the total dollars planned to be subcontracted to" small businesses and other disadvantaged businesses, *id.* ¶ 66 (quoting 49 C.F.R. § 19.704(a)(2)). A subcontracting plan by a prime

contractor whose bid is accepted is "included in and made a material part of the contract." *Id.* ¶ 71 (quoting 15 U.S.C. § 637(d)(4)(B) (emphasis removed)).  Controlling federal regulations also require the federal prime contractor to submit semi-annual reports that detail each of its subcontracts with small businesses and "the extent of its compliance with its small business subcontracting plan." *Id.* ¶ 68 (citing 49 C.F.R. § 52.219-9).  The "failure of any contractor or subcontractor to comply in good faith with," *inter alia*, "any plan required of such contractor pursuant to the authority of [15 U.S.C. § 637]," such as the previously-described subcontracting plan, is "a material breach of such contract or subcontract and may be considered in any past performance evaluation of the contractor."  15 U.S.C. § 637(d)(9); *see also* Am. Compl. ¶ 81 (citing 15 U.S.C. § 637(d)(9); 48 C.F.R. § 52.219-9(k)).

For purposes of assessing eligibility for government contracts, the size of a business is determined by federal regulation.  *See* 13 C.F.R. § 121.101 (defining SBA size standards that determine "whether a business entity is small and thus, eligible for Government programs and preferences reserved for 'small business' concerns").  The North American Industry Classification System ("NAICS") defines the relevant size standards by industry.  *Id.*  For federal government contracting programs, "a concern must not exceed the size standard for the NAICS code specified in the solicitation."  *Id.* § 121.402; *see also* Am. Compl. ¶ 83 (citing 13 C.F.R. §§ 121.401–413).  To determine the size of a concern, "SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue," as well as those of any of its affiliates.  13 C.F.R. § 121.103(a)(6); *see also* Am. Compl. ¶ 84 (citing 13 C.F.R. § 121103(a)(6)).

In this case, the industry that applies to ED's PCAs task orders is "debt collection services," which is classified as NAICS code 561440.  Am. Compl. ¶ 85.  From the time of the

initial ED task order awarded in early 2009, *id.* ¶ 52, until January 7, 2013, a concern could qualify as a small business entity pursuant to this code if its average annual receipts totaled no more than $7 million over the most recent three-year period, *id.* ¶ 85. From January 7, 2013 to July 2014, the operative size standard for NAICS code 561440 increased to $14 million, and on July 14, 2014, it increased to $15 million. *Id.* An individual business is deemed affiliated with another entity for these size calculations "when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.103; Am. Compl. ¶ 89 (citing 13 C.F.R. § 121.103(a); U.S. Small Bus. Admin., *A Handbook for Small Business Liaison Officers* ("*SBLO Handbook*") 16 (2010), https://www.sba.gov/sites/default/files/articles/Small_Business_Liaison_Officer_(SBLO)_Handbook_6_2010.pdf).[4] There is no firm rule to make such an affiliation determination; rather, it is based on the SBA's consideration of "the totality of the circumstances," including "factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships." 13 C.F.R. § 121.103(a)(2), (a)(5); *see also* Am. Compl. ¶ 92 (discussing applicable regulations).

The question of affiliation is at the heart of Relator's allegations in the instant suit. Affiliation determinations affect a business's size, and determinations concerning the size of a business affect eligibility for particular contracting and/or subcontracting opportunities. *See* 13 C.F.R. § 121.402; Am. Compl. ¶ 86. Thus, to state what is perhaps obvious, determining whether a business is small requires consideration of any affiliation. Here, Relator's allegations of fraud hinge on the contention that several ED PCA prime contractors and their associated subcontractors concealed the fact that the purportedly small business subcontractors were

---

[4] Relator also cites to 49 C.F.R. § 19.101; however, because Title 49 refers to transportation and because it contains no Section 19, the Court omits this citation.

affiliated with "co-conspirator" larger businesses, "making them ineligible to be claimed as small businesses by the prime contractors on the ED PCA task orders." Am. Compl. ¶ 9. To contextualize the details of Relator's factual allegations and associated claims for relief, the Court next describes the parties and the relationship among them.

### 2. The Parties

#### a. Relator

Relator PCA Integrity is a general partnership registered in Delaware. *Id.* ¶ 26. This entity is "not distinct from its [three] partners," who have "personal knowledge of the false claims, statements, and concealments" alleged. *Id.* ¶ 27. Relator identifies itself as "participants in the PCA initiative working for certain PCAs," which provided Relator with "direct knowledge of the conduct alleged" that it also built up through an "independent investigation to uncover false claims submitted to the United States." *Id.* ¶ 29. Accordingly, PCA Integrity avers that it is an original source of non-publicly disclosed information underpinning the claims, which it voluntarily provided to the government before filing a complaint in this suit. *Id.* ¶¶ 28–29.

#### b. Defendants

PCA Integrity brings claims against three clusters of Defendants, with each group consisting of a prime contractor, a subcontractor, and an allegedly affiliated "co-conspirator" business."[5] *Id.* ¶ 9.

More specifically, the operative amended complaint lodges allegations against the following groups of Defendants:[6]

---

[5] In clustering Defendants in this manner, the Court follows Relator's lead in its pleading, *see* Am. Compl. ¶ 9 (describing "three distinct groups" of Defendants), and in the styling of its oppositions to Defendants' motions to dismiss, *see* ECF Nos. 95, 96, 97 (grouping oppositions to Defendants' arguments into three clusters). *See also* Part. Mot. Leave to File Omnibus Briefs in Opposition 1, ECF No. 94 (identifying "three groups of Defendants" consisting of a prime contractor, a subcontractor, and an allegedly affiliated business for each group).

|  | **Group 1** | **Group 2** | **Group 3** |
|---|---|---|---|
| ***Prime Contractor*** | Continental Service Group, Inc., d/b/a ConServe ("ConServe") | Pioneer Credit Recovery, Inc. ("Pioneer") | Alorica, Inc. ("Alorica") / Global Receivables Solutions, Inc. ("GRSI"), f/k/a West Asset Management, Inc. ("WAM")[7] |
| ***Subcontractor*** | Protocol Financial Service, LLC ("Protocol") | Edgewater Consulting Group, LLC, d/b/a Edgewater Financial Services ("Edgewater") | Uniquity Financial, LLC ("Uniquity") |
| ***Allegedly Affiliated Business*** | State Collection Services, Inc. ("State") | Bass & Associates, P.C. ("Bass") | Professional Recovery Consultants, Inc. ("PRC") |

In Group 1, ConServe, a collection and accounts receivable management services provider that is headquartered in New York, was the prime contractor with ED. *Id.* ¶ 30–31. ConServe "specializes in the higher education market." *Id.* ¶ 30. The subcontractor defendant in this cluster is Protocol, a Wisconsin-based debt collection firm that was incorporated in 2009 and "identifies itself as a 100% woman-owned business located in a [traditionally economically

---

[6] Relator's amended complaint removed several Defendants and added two new allegedly-affiliated businesses, Professional Recovery, Inc. and State Collection Service, Inc., as Defendants. *Compare* Compl. 1–2, ECF No. 1, *with* Am. Compl. 1–2. The Court considers only the facts and allegations presented in the amended complaint. *See Pinson v. U.S. Dep't of Justice*, 69 F. Supp. 3d 108, 113 (D.D.C. 2014) (citing *Owens v. Republic of Sudan,* 412 F. Supp. 2d 99, 117 (D.D.C .2006), *aff'd and remanded on other grounds,* 531 F.3d 884 (D.C. Cir. 2008); 6 Charles A. Wright, Arthur R. Miller & Mary Kane, *Federal Practice and Procedure* § 1476 (3d ed.) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case.").

[7] The original prime contractor for this group was WAM, which was at the time a division of West Corporation. Am. Compl. ¶¶ 32–33. Alorica acquired West Corporation's "agent services business, including [WAM]," in January 2015, *id.* ¶ 32, and WAM was subsequently rebranded as GRSI, *id.* ¶ 35. The Court discusses Relator and Alorica/GRSI's joint motion to dismiss claims against Defendant West Corporation, ECF No. 77, *infra* Part IV.A. For expositional clarity, the Court refers to WAM in discussing the factual allegations that involve this prime contractor, since WAM was the operative entity at the time of the events alleged.

disadvantaged] HUBZone."[8]  *Id.* ¶ 37.  The Chief Executive Officer ("CEO") of Protocol is Tina Hanson, and its President is Tracy Dudek, "both of whom hold key management positions with Defendant State."  *Id.*  The allegedly affiliated business, State, is a debt collection firm that is headquartered in Wisconsin.  *Id.* ¶ 40.  State is run by Tom Haag, Tina Hanson's "longtime domestic partner."  *Id.*

In Group 2, Pioneer, a debt collection firm with offices in Florida, New Jersey, and New York and headquarters in New York, was the prime contractor with ED.  *Id.* ¶ 36.  The subcontractor defendant in this cluster is Edgewater, a debt collection services provider that operates out of two branches in Washington State (incorporated 2010) and Arizona (incorporated 2011).  *Id.* ¶ 39.  The allegedly affiliated business, Bass, is a "woman-owned bankruptcy and collections firm" headquartered in Arizona.  *Id.* ¶ 42.  Patricia Hoskins Bass founded Bass in 1990 and serves as its President and CEO.  *Id.*  The Bass and Edgewater headquarters are located next door to one another in Tucson, Arizona.  *Id.* ¶ 270.

In Group 3, WAM is an accounts-receivable management services provider that "has provided collection services for the recovery of government and higher education debt for over a decade."  *Id.* ¶ 33.  The parent corporation of this entity at the time of the original ED contract was West Corporation, which is headquartered in Nebraska.  *Id.* ¶ 32.  The subcontractor defendant in this cluster is Uniquity, a debt collection firm created in 2011 that is headquartered in Texas and has offices in North Carolina.  *Id.* ¶ 38.  Uniquity is led by its President, Jamie Michael Cameron, and Geoffrey Miller and Stephen Miller are "Members."  *Id.*  The allegedly affiliated business, PRC, "provides debt collection and recovery services" to multiple sectors,

_____

[8] The HUBZone program was created by the Small Business Act of 1997 to set aside contracts for small businesses located in areas that have traditionally "suffered from a lack of investment."  Am. Compl. ¶¶ 102–104 (quoting S. Rep. No. 105-62, at 25 (1997)) (citing 13 C.F.R. § 126.200).

including the government.  *Id.* ¶ 41.  PRC was founded in 1979 by CEO Stephen Miller, and his son Geoffrey Miller is its President.  *Id.*  PRC is headquartered in North Carolina at the same address, 2700 Meridian Parkway, Suite 200, that houses one of Uniquity's offices.  *Id.* ¶¶ 38, 41.

In addition to these named Defendants, Relator's amended complaint also brings claims against "John Does #1-50," a group that consists of "individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the" alleged scheme, *id.* ¶ 43, and thereby cause the United States to suffer "financial harm," *id.* ¶ 45.  No further details are provided concerning the John Doe Defendants.

### 3.  Relator's Allegations

As its grouping of Defendants suggests, Relator's factual allegations involve actions taken by three distinct clusters of prime contractors, subcontractors, and allegedly associated businesses.  The basic form of the scheme is the same, in broad strokes, across each of the categories (prime contractors, subcontractors, and allegedly associated businesses), though the precise means by which Relator alleges it occurred is unique to each Defendant.  Thus, the Court will discuss Relator's factual allegations concerning each of these categories before detailing the specific factual allegations concerning each individual Defendant.

#### a.  *Factual Allegations Regarding Categories of Defendants*

First, Relator alleges that each of the prime contractors—ConServe, WAM, and Pioneer—"defrauded the government by falsely claiming credit for awarding millions of dollars in subcontracts to businesses that were, in fact, other than small."  *Id.* ¶ 10.  This scheme benefited these prime contractors because submission of "false certifications to the government"

permitted each prime contractor to receive a higher CPCS score. *Id.* As a result, the government:

> was induced to (1) believe that the Prime Contractor Defendants were in compliance with their small business subcontracting plans; (2) award subsequent task order extensions, invitations to compete on a now-outstanding ED solicitation for the same services, and, in the case of ConServe, an additional two-year award extension; (3) pay Prime Contractor Defendants millions of dollars in contractually-mandated monetary bonuses; and (4) provide those Defendants with additional business volume, resulting in higher revenues and profits.

*Id.* ¶ 11.

In furtherance of this scheme, Defendants "made numerous material false statements and certifications" to the government. *Id.* ¶ 13. For one, the required subcontracting plans that the prime contractors each submitted to ED "falsely represented that they intended to comply in good faith with their Subcontracting Plans." *Id.* In addition, these prime contractor defendants submitted "monthly invoice reports . . . for work allegedly performed by small businesses" as well as "mandatory reports to the Government regarding their utilization of small businesses in their subcontracts." *Id.*

Second, Relator alleges that each of the subcontractor defendants—Protocol, Edgewater, and Uniquity—falsely represented themselves to the government by claiming eligibility for "awards on small business subcontracts when they were, in fact, ineligible because each named Prime Contractor Defendant and/or Co-Conspirator Defendant was 'affiliated' with each of their respective Subcontractor Defendants under SBA rules and regulations." *Id.* ¶ 14. Each subcontractor defendant's self-certification that it was a small business led the United States to pay the associated prime contractor defendant, "which then subcontracted work and diverted compensation" to the subcontractor defendant. *Id.*

Finally, Relator alleges that each of the "co-conspirator" defendants—State, Bass, and PRC—"were affiliated with their respective Subcontractor Defendants." *Id.* ¶ 16. Because these entities were affiliated, the subcontractor defendants were "ineligible small businesses for purposes of the special subcontracting preferences under the ED PCA task orders." *Id.*

At bottom, then, all of the alleged fraud across the three categories of Defendants hinges on the factual allegation of undisclosed affiliation and associated submission of false claims and / or misrepresentations concerning business size. The Court next summarizes Relator's factual allegations concerning each of the Defendants, beginning with the prime contractor defendant in the first group, then discussing the other entities in that group, and then repeating this pattern for the second and third groups.

### b. *Factual Allegations Regarding Defendants*

### i. Group 1: ConServe, Protocol, and State

On an unspecified date, prime contractor defendant ConServe received the GSA contract that "led to the award of the ED PCA task order." *Id.* ¶ 132. ConServe was "required to establish and implement a small business subcontracting plan," which it "committed to implementing" in good faith. *Id.*; *see also id.* ¶ 134. This plan, which "represented that a portion of the work it subcontracted would go to small businesses," *id.* ¶ 134, was "incorporated into the ED PCA task order by reference and made a material part of the contract," *id.* ¶ 132. Thereafter, with an awareness of ED's CPCS incentives for small business contracting, ConServe awarded a subcontract to Protocol under the ED PCA task order. *Id.* ¶ 133. Protocol filed annual self-certifications with the SBA indicating its status as a small business, with the most recent self-certification made in 2014. *Id.* ¶¶ 186–87.

Protocol shares both location and personnel with State. The two businesses have the same address, *id.* ¶ 140, and the point of contact for Protocol's online certification in a government database, SAM.gov, is the executive administrator at State, *id.* ¶ 141. Protocol's upper-level management, moreover, consists of several individuals who are also involved with State. *Id.* ¶¶ 138–39. "For example, Tina Hanson is the Co-Owner and CEO of Protocol, while also serving as Executive [Vice President ("VP")] and Chief Strategy Officer for State. Meanwhile, Tracy Dudek serves as the Co-Owner and President of Protocol, while simultaneously working as the VP of Operations at State." *Id.* ¶ 138. Ms. Hanson "frequently holds herself out as a representative for State" in industry events and meetings, "going even so far as handing out business cards" that list her "senior management position at State. *Id.* ¶ 139; *see also id.* ¶ 146 (noting Ms. Hanson's nomination for an award and relating her conversation with State colleagues discussing why "she should accept the award as a Protocol employee"). Upper-level Protocol management also exchanged emails using their State email addresses. *Id.* ¶¶ 163; 171–72. The two companies share more personal connections, as well: State's CEO, Mr. Haag, is the domestic partner of Protocol's CEO and Co-Owner, Ms. Hanson. *Id.* ¶ 142. The overlap among employees also includes other, non-managerial staff. *See id.* ¶¶ 153–55 (discussing the movement of employees from State to Protocol and the sharing of employees across the two entities); *id.* ¶ 156 (May 14, 2013 email chain discussing sharing of employees and what Protocol "had done in the past for others for Hubzone purposes").

Furthermore, Protocol and State's finances and communications indicate a connection between the entities. First, "since Protocol was formed, State has managed all of Protocol's financial operations, including accounting and payroll." *Id.* ¶ 147. Second, Protocol was able to rely on State's financial support as a safety net, as when, for instance, Mr. Haag lent Ms. Hanson

and Ms. Dudek the capital they required to form Protocol at a low interest rate and "was prepared to forgive this loan entirely if Protocol had been unsuccessful." *Id.* ¶ 148. This assistance extended to resource-sharing: "[a]t least until May 2012, Protocol did not have" any utility bill "in its own name and had not established its own relationships with vendors," instead relying on State for its infrastructure. *Id.* ¶¶ 158–159; *id.* ¶ 159 (documenting Protocol expense report consisting of State form on which name was crossed out and replaced with Protocol's name); *id.* ¶ 170 (documenting email notifying Ms. Hanson and Ms. Dudek that they would have pictures taken for both entities' websites on the same day and recommending that they bring two outfits). Third, State provided Protocol with "cash infusion[s]," as evidenced by a March 3, 2010, email requesting $25,000 to cover the cost of payroll. *Id.* ¶ 149. Finally, "Protocol hid its operating expenses on State's accounts," as indicated in an April 27, 2009, email in which Ms. Hanson informed Ms. Dudek that she should book trips taken on behalf of Protocol "under State." *Id.* ¶ 151. These financial interactions led Ms. Hanson to express concern, in a December 16, 2010, email, that the Wisconsin Department of Financial Institutions would not relicense Protocol given "[t]he way financials look today." *Id.* ¶ 152.

Protocol's co-founders also discussed how to respond to government inquiries concerning the two entities. In 2013, when Ms. Hanson and Ms. Dudek pursued HUBZone certification (as a small business operating in a traditionally disadvantaged area), the SBA "flagged State and Protocol as potentially affiliated (and thus ineligible for HUBZone certification)." *Id.* ¶ 166. In a July 10, 2013 email chain, the two women discussed how to indicate to the SBA that "there is no affiliation" when "the owners of a HUBZone business have paid w2 positions at a different company." *Id.* Protocol ultimately withdrew its application for HubZone certification. *Id.* ¶ 168. Subsequently, State and Protocol "reached a consensus to withhold" their managerial

agreement in response to a 2015 inquiry from a field auditor with the Wisconsin Department of Workforce Development. *Id.* ¶ 169.

During this time, ConServe's interactions with the companies indicate an awareness of the close relationship between them. "From the time of Protocol's inception," Chris Lang, the Vice President for Contract Administration at ConServe, "provided advice to State and Protocol's officers concerning the bare minimum of separation needed to maintain the appearance of independence." *Id.* ¶ 175. For instance, Mr. Lang advised Ms. Dudek in an October 19, 2009, email that the use of State emails for Protocol business made some individuals at ConServe "uneasy." *Id.* ¶ 176. Nonetheless, the shared use of emails continued, *id.* ¶ 177, and Mr. Lang emailed Ms. Dudek (who held positions at both companies) at both addresses on August 18, 2011, to inquire about Protocol's registration as a small business on the GSA website ccr.gov, *id.* ¶ 179. Mr. Lang also corresponded with Ms. Dudek regarding Protocol: his May 10, 2012, email with Ms. Dudek concerning Protocol's HUBZone certification revealed to him Protocol's plans to consider "all addresses" for employees in "the Beloit [HUBZone] from our friends at State to see if anyone can transfer over and do some work for Protocol." *Id.* ¶ 182. Previously, on December 19, 2011, ConServe leadership had emailed Ms. Dudek to ask about State's new operations program. *Id.* ¶ 180. Moreover, breaking from what Mr. Lang represents as ConServe's "policy of reviewing audited financial statements from its subcontractors . . . [to] ensure size and ownership," ConServe never insisted on audited financial statements from Protocol. *Id.* ¶ 181.

ii. Group 2: Pioneer, Edgewater, and Bass

Prime contractor Pioneer engaged in a substantially similar pattern of conduct, albeit with distinct details, with subcontractor Edgewater and allegedly affiliated company Bass. At an

unspecified date, Pioneer was awarded the ED PCA task order and submitted a small business subcontracting plan. *Id.* ¶ 237. This subcontracting plan "represented that a portion of the work" that Pioneer "subcontracted would go to small businesses" and was incorporated into the task order by reference, becoming a material part of the contract, *id.* ¶¶ 237–38. Pioneer then "awarded Edgewater a subcontract under the ED PCA task order, effectively replacing" Bass "as Pioneer's sole subcontractor." *Id.* ¶ 241; *see also id.* ¶ 246 (noting that Bass had served as a small business subcontractor to Pioneer prior to the ED PCA task orders). Subcontractor Edgewater has represented itself as a small business through its self-certifications "[a]t all times material" to the instant allegations. *Id.* ¶ 242. Edgewater's most recent self-certification, which attests to its small business status, was made in 2014. *Id.* ¶ 282. It has also "self-certified to the Government that, since at least 2009, its average annual receipts over the prior three years have been less than the prior $7 million [NAICS] threshold (in effect from 2007 through January 6, 2013), the prior $14 million threshold (from January 7, 2013 through July 13, 2014), or the current $15 million threshold." *Id.* ¶ 242.

Initially, before Pioneer subcontracted with Edgewater, Pioneer and Bass made overtures to continue their past contracting with respect to the ED contract. On January 16, 2009, Bass and Pioneer "held a Kick-off Meeting" at which Patti Bass, her brother, Rob Hoskins, and Aleksandra Radmanovic represented Bass; at this meeting, Pioneer was represented by Collections Director Bryan Wiler as well as numerous other employees. *Id.* ¶ 248. On November 6, 2009, Mr. Hoskins sent an email confirming a November 11–12, 2009, meeting that would "focus on measuring performance on the ED subcontract between Pioneer and Bass." *Id.* ¶ 250. Between November 2009 and March 2010, however, both Pioneer and Bass "acknowledged that Bass was no longer going to qualify as an eligible small business for

purposes of subcontracting under the ED PCA task order." *Id.* ¶ 251. Ms. Bass's own actions with regard to a different subcontract confirm this conclusion: on April 12, 2010, she completed a self-certification indicating that Bass "has average annual revenues for the past three years that exceeded $7 million"—making Bass ineligible as a small business for debt collection services under the relevant NAICS code. *Id.* ¶ 252. Less than ten days later, Pioneer's Collection Director, Mr. Wiler, emailed Ms. Bass stating that, due to Bass's status as a large business, Pioneer "had not 'been able to identify a benefit to [it]' in extending the subcontract" with Bass. *Id.* ¶ 253. Mr. Wiler proceeded to ask which Bass employees would become Edgewater employees. *Id.* ¶ 254.

Edgewater was then formally created. On April 23, 2010, Ms. Bass and Bass itself "signed a Purchase and Sale Agreement with her brother, Mr. Hoskins, and Edgewater to sell the 'Business Opportunity' of subcontracting with Pioneer under the ED PCA task order" at a purchase price of $1 million. *Id.* ¶ 255. That same day, Edgewater received a $1 million loan from Bass. *Id.* Four years after this loan, Mr. Hoskins and Edgewater had not repaid it, and Ms. Bass agreed to continued forbearance for $50,000 and the "promise of continued payments in the future." *Id.* ¶ 269. Pioneer was "fully aware" of this sale because Mr. Wiler had been "coordinating the transition for the ED subcontract" since April 15, 2010. *Id.* ¶ 255. He did so with the assistance of a Bass employee, to whom he explained that "[a]ll that will need to change on the letters [to be sent to debtors as part of the ED collection efforts] is the name of the company." *Id.* ¶¶ 257–58.

Bass and Edgewater also share both a physical location and employees. First, Edgewater's principal place of business is located next door to Bass, in a building owned by Ms. Bass since June 2010. *Id.* ¶ 270. In the fall of 2010, Ms. Bass signed building permit

applications for construction at this same address, listing office space for Bass as the stated use of the property. *Id.*

Second, key personnel at Bass were "substantial[ly] involve[d]" with Edgewater, with Pioneer's knowledge. *Id.* ¶ 260. Ms. Radmonovic, who had participated in the original Pioneer-Bass kick-off meeting, held a senior managerial role at Edgewater "since at least 2010" and, until 2014, she simultaneously served as Strategic Planning and Client Services Executive at Bass. *Id.* ¶ 261. At industry trade shows and on her LinkedIn profile, she indicates overlapping employment. *See id.* (noting Bass affiliation at industry trade shows and ED PCA meetings in 2012 and 2013); *id.* ¶ 262 (reproducing LinkedIn profile that describes roles at Edgewater from 2010 to 2015 and roles at Bass from 2003 to 2015). In addition to Ms. Radmonovic, Mr. Hoskins was affiliated with both companies and repeatedly discussed Edgewater business on his Bass email account. *Id.* ¶¶ 263–67. In one such email on May 22, 2014, Mr. Hoskins indicated to a Pioneer employee that he and Ms. Bass had engaged in conversations about "loaning" collectors from Bass to Edgewater. *Id.* ¶ 266. In other communications with Mr. Wiler of Pioneer, Mr. Hoskins forwarded ED's feedback on Bass's July 2015 quality control plan, and Mr. Wiler responded by stating that Pioneer handled its oversight with Edgewater by ensuring "compliance in the same exact fashion as if the work was being done by one of our own teams." *Id.* ¶ 267. Pioneer not only supported Edgewater in its words, but also more materially: "[o]ther than the revenues received from Pioneer under the task order, Edgewater does not generate much, if any, revenue." *Id.* ¶ 274.

### iii. Group 3: WAM, Uniquity, and PRC

Prime contractor WAM's involvement with subcontractor Uniquity and allegedly affiliated company PRC represents another iteration of this basic scheme.[9]  As a condition of receiving the contract that led to the award of ED PCA task order, WAM submitted a small business subcontracting plan that became a material part of its contract with the government.  *Id.* ¶¶ 195– 97.  WAM then awarded Uniquity a subcontract under the ED PCA task order.  *Id.* ¶ 199.  Uniquity's most recent annual self-certification affirming its small business status was made in 2013.  *Id.* ¶ 230.

There are several connections between Uniquity and PRC.[10]  Uniquity was created in 2011 by the shareholders of PRC "to assist lenders in the collection of student debt."  *Id.* ¶ 204.

---

[9] Relator's factual allegations at times refer to WAM as the prime contractor for this group of Defendants, *see, e.g.*, Am. Compl. ¶ 10 (discussing "prime contractor[s] . . . Global Receivables Solutions, Inc. f/k/a West Asset Management, Inc."), and at times refer to "Prime Contractor Defendant West Corporation," *see, e.g.*, *id.* ¶ 195.  Relator's opposition states that the "Amended Complaint exclusively references West Corporation in the factual allegations for the sake of convenience."  Opp'n to Defs. Alorica/GRSI's, Uniquity's, and PRC's Mot. Dismiss 34 n.11, ECF No. 97.  As noted previously, West Corporation was the parent company of WAM until 2015, when Alorica acquired West and WAM was rebranded as GRSI.  Adding to this confusion, in their reply brief, Defendants collectively refer to Alorica and GRSI as the "WAM Defendants."  Alorica/GRSI Reply Supporting Mot. Dismiss ("Alorica/GRSI Reply") 1, ECF No. 104.  Based on the relationship among the entities articulated in the amended complaint, the Court construes WAM as the operative prime contractor during the time of the allegations.  For expositional clarity, the Court uses the term "WAM" only in discussing the factual allegations against the prime contractor associated with this group of Defendants.  The Court further discusses these issues in addressing the parties' joint motion to dismiss Defendant West.  *See infra* Part IV.A.

[10] Relator's factual allegations concerning Uniquity also include a number of statements that Uniquity fraudulently mispresented its woman-owned small business ("WOSB") status.  *See* Am. Compl. ¶¶ 208–212.  Even granting Relator's complaint the generous read it is due at this stage of litigation, the Court cannot discern a connection between WOSB status and the alleged false claims—based on misrepresentations concerning *business size*—that Relator contests in this suit.  *See id.* ¶¶ 229–36 (discussing how Uniquity, PRC, and West "[s]ubmitted or [c]aused the [s]ubmission of [f]alse [c]laims to the United States Government" through its "misrepresentations concerning Uniquity's small business status").  Thus, the Court omits this set of factual allegations.

These PRC shareholders "maintain a 48% equity interest" in Uniquity. *Id.* PRC has provided support to Uniquity by "fund[ing] significant organizational and start-up costs" and providing employees to "carr[y] out . . . [Uniquity's] accounting and other administrative functions." *Id.* Due to PRC's financial investments in PRC, PRC's accountants have concluded that Uniquity "is a variable interest entity" of PRC, a designation that requires Uniquity's activities "to be consolidated in the analysis of PRC's financial statements." *Id.* ¶ 205. Moreover, the two companies have reported the same operating office address in Durham, North Carolina, and Uniquity additionally lists the residence of PRC's CEO as a business address. *Id.* ¶ 206.

Uniquity's email correspondence and business interactions with WAM involved PRC on several occasions. On June 21, 2011, Uniquity President Jamie Cameron introduced his "business partner," PRC President and Uniquity Member Geoff Miller, to individuals at WAM, *id.* ¶ 215. On July 19, 2011, WAM requested additional financial information about Uniquity. *Id.* ¶ 216. In response, Mr. Cameron suggested that WAM "could simply rely on the financial information of the better-established PRC." *Id.* A year and a half later, when WAM incurred skip tracing expenses for which Uniquity was responsible, PRC remitted the funds to WAM. *Id.* ¶ 219. Additionally, when PRC's comptroller emailed a WAM employee to request "a copy of our 1099," WAM's employee began helping PRC to locate Uniquity's 1099. *Id.* ¶¶ 220–21 (emphasis removed),[11] suggesting a working familiarity with both entities' business operations. *See id.* ¶ 220.

---

[11] In addition to these factual allegations concerning the relationship between PRC and Uniquity and WAM's knowledge of this relationship, Relators contend that Uniquity and WAM are affiliated through economic dependence. Am. Compl. ¶¶ 223–28. As Uniquity argues in its reply brief, Relator's opposition "did not oppose, and therefore concedes, Uniquity's argument that it could not have been affiliated with [WAM] by 'economic dependence.'" Def. Uniquity's Reply Supporting Mot. Dismiss 4, ECF No. 109; *see also* Alorica/GRSI Reply 3 ("The Opposition abandons half of the alleged grounds for finding affiliation—and the entire basis for

## B.  Procedural History

Relator initially filed this lawsuit on May 20, 2015.  *See* Compl.  The Government

declined to intervene on October 1, 2018.  *See* U.S.'s Notice of Election to Decline Intervention,

ECF No. 31. The original complaint was then unsealed, *see* Oct. 9, 2018 Order, ECF No. 32, and

summonses were issued for Defendants Bass, ConServe, Edgewater, Pioneer, Protocol, Uniquity,

and West on February 2, 2019, *see* ECF No. 36.  Relator filed an amended complaint on March

28, 2019, lodging claims against the same seven Defendants and adding Defendants Alorica,

State, and PRC.  Am Compl.  The amended complaint stated that Relator "voluntarily provided

the Government with the information upon which the allegations" in it "are based prior to the

filing of the Original Complaint in accordance with 31 U.S.C. § 3730(b)(2)," *id.* ¶ 28, the *qui*

*tam* provision of the False Claims Act.

This amended complaint includes four counts.  Count I alleges that "Defendants

knowingly submitted, or caused to be submitted, false claims for payment to the United States, in

violation of 31 U.S.C. § 3729(a)(1)(A)." *Id.* ¶ 326.  Count II alleges that Defendants "knowingly

used false records or statements to get false or fraudulent claims paid or approved by the United

States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).  *Id.* ¶ 331.  Count III alleges that

"Defendants knowingly conspired, and may still be conspiring, with the various entities and/or

persons alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of

31 U.S.C. §§ 3729(a)(1) & a(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(b))." *Id.* ¶ 334.  Finally,

---

asserting a Uniquity-WAM affiliation—by completely failing to address the lack of an
"economic dependence" (thus conceding this argument)).  Under this Circuit's clear precedent,
"if a party files an opposition to a motion and therein addresses only some of the movant's
arguments, the court may treat the unaddressed arguments as conceded." *Texas v. U.S.*, 798 F.3d
1108, 1110 (D.C. Cir. 2015); *see also De La Fuente v. DNC Servs. Corp.*, No. 18-cv- 336 (RC),
2019 WL 1778948, at *4 (D.D.C. Apr. 23, 2019).  Because the Court treats these arguments as
conceded, it does not relate the underlying factual allegations.

Count IV alleges that "Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government," thereby violating 31 U.S.C. § 3729(a)(1)(G). *Id.* ¶ 337. Summonses were issued for the Defendants referenced in the amended complaint on April 1, 2019. *See* ECF No. 57.

The parties then filed multiple motions. Relator and Defendants Alorica and GRSI jointly moved to dismiss the claims against Defendant West, asking the Court to grant a dismissal agreement wherein Alorica/GRSI agreed to assume any liabilities arising as to Defendant West due to the alleged conduct of WAM. *See* ECF No. 77. Each of the Defendants also moved to dismiss Relator's amended complaint. *See* Def. PRC's Mot. Dismiss ("PRC Mot."), ECF No. 79, Def. Protocol's Mot. Dismiss ("Protocol Mot."), ECF No. 81, Def. Bass's Mot. Dismiss ("Bass Mot."), ECF No. 85, Def. Alorica/GRSI's Mot. Dismiss ("Alorica/GRSI Mot."), ECF No. 86, Def. Edgewater's Mot. Dismiss ("Edgewater Mot."), ECF No. 87, Def. Pioneer's Mot. Dismiss, ECF No. 88, Def. ConServe's Mot. Dismiss ("ConServe Mot."), ECF No. 92, and Def. State's Mot Dismiss ("State's Mot."), ECF No. 93. In addition, Defendant ConServe moved for judicial notice, ECF No. 92, followed by Relator's own motion for judicial notice, ECF No. 98. These motions have been briefed and are ripe for the Court's consideration.

## III. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard and asks whether the plaintiff has properly stated a claim.

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A court considering such a motion takes the complaint's factual allegations to be true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are thus insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

### B. Federal Rule of Civil Procedure 9(b) and the FCA

For FCA fraud actions, a heightened pleading standard applies. *See United States ex rel. Totten v. Bombardier Corp.* (*Totten I*), 286 F.3d 542, 551 (D.C. Cir. 2002) ("[B]ecause the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)."). In such a suit, it is not enough to comply with Rule 12(b)(6); rather, FCA "plaintiffs must plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Universal Health Servs., Inc. v. United States* (*Universal Health Services*), 136 S. Ct. 1989, 2004 n.6 (2016); *see also* Fed. R. Civ. P. 9(b) (requiring a party "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake"). That said, "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, "'[i]n an FCA fraud action, Rule 9(b) requires, at a minimum, that the pleader state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud' and 'individuals allegedly involved in the fraud.'" *Pencheng Si v. Laogai Research Foundation* (*Si II*), 71 F. Supp. 3d 73, 85 (D.D.C. 2014) (quoting *Williams v. Martin-Baker Aircraft Co., Ltd.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004)); *see also United States ex rel. Landis v. Tailwind Sports Corp.* (*Landis*), 51 F. Supp. 3d 9, 49 (D.D.C. 2014), *on reconsideration in part,* 160 F. Supp. 3d 253 (D.D.C. 2016), and *clarified on denial of reconsideration,* No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016) (discussing pleading standard and quoting *Williams*, 389 F.3d at 1256); *Totten I*, 286 F.3d at 551 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (2d ed. 1990)). Put slightly differently, "the plaintiff must provide the 'who,' 'what,' 'when,' and 'where' with respect to the circumstances of the fraud." *United States v. Comstor Corp.* (*Comstor*), 308 F. Supp. 3d 56, 68 (D.D.C. 2018) (quoting *United States ex rel. Heath v. AT & T, Inc.* (*Heath*), 791 F.3d 112, 124 (D.C. Cir. 2015)). "This requirement of particularity 'serve[s] to discourage[] the initiation of suits brought solely for their nuisance value, . . . safeguards potential defendants from frivolous accusations of moral turpitude,'" *Heath*, 791 F.3d at 123 (internal quotation marks omitted) (quoting *Williams*, 389 F.3d at 1256), and "ensure[s] that defendants have adequate notice of the charges against them to prepare a defense," *Si II,* 71 F. Supp. 3d at 85 (quoting *United States ex. rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003)).

### C. Claims Brought under the FCA

The FCA's *qui tam* provision, 31 U.S.C. § 3730(b)(1), permits private parties termed "relators," to sue on behalf of the government in order to redress false or fraudulent claims made to the government. *See Williams*, 389 F.3d at 1254. However, in such a *qui tam* suit, conditions apply in the form of the FCA's public disclosure bar: "seeking to prevent suits 'by those other than an original source when the government already has enough information to investigate the case' or where 'the information could at least have alerted law-enforcement authorities to the likelihood of wrongdoing,' the FCA's public disclosure bar blocks *qui tam* suits that are 'based upon the public disclosure of allegations or transactions.'" *United States ex rel. Doe v. Staples, Inc.* (*Staples*), 773 F.3d 83, 86 (D.C. Cir. 2014) (internal quotation marks omitted) (first quoting *United States ex rel. Davis v. District of Columbia,* 679 F.3d 832, 836 (D.C. Cir. 2012), then quoting 31 U.S.C. § 3730(e)(4)(A) (1986)); *see also* 31 U.S.C. § 3730(e)(4)(A).

This Circuit set forth the relevant analysis to determine whether there has been a public disclosure in *United States ex rel. Springfield Terminal Railway v. Quinn* (*Springfield Terminal*), 14 F.3d 645 (D.C. Cir. 1994). *Springfield Terminal* provides a formula to solve the public disclosure question: "if X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *Id.* at 654 (emphasis in original). Thus, "a qui tam action cannot be sustained where both elements of the fraudulent transaction—X and Y—are already public, even if the relator 'comes forward with additional evidence incriminating the defendant.'" *Staples*, 773 F.3d at 86 (quoting *Springfield Terminal*, 14 F.3d at 655).

An exception to the public disclosure bar applies if the relator is an "original source" of the information. "Original source" is defined by the statute as a person who either (1) "has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," prior to a "public disclosure" as defined by the statute, or (2) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action" under the FCA's *qui tam* provision. 31 U.S.C. § 3730(e)(4)(B).

In this case, Relator claims original source status and brings four FCA claims.[12] The Court will next outline the operative legal standard for each of Relator's claims in the instant suit before turning to its analysis of Defendants' motions to dismiss.

### 1. Presentment and False Statement Actions

The FCA, as amended, creates civil liability for "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). These two clauses are known as the "presentment clause" and the "false statement clause," respectively. FERA's 2009 amendments broaden the reach of both clauses. First, the changes to the presentment clause "removed language requiring that the claim be presented to an officer or employee of the government or armed forces." *Comstor*, 308 F. Supp. 3d at 78 (citing FERA § 4(a)). Second,

---

[12] Technically speaking, Relator's amended complaint can be read as bringing eight claims. On May 20, 2009, Congress amended the FCA by enacting the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 stat. 1617. Relator suggests that the claims may implicate both the pre- and post-amendment versions of the statute. *See* Am. Compl. 84 n.8 ("To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g., 31 U.S.C. § 3729(a)(1) (2006)."); *id.* at 85–86 nn.9–12 (same). The Court thus discusses both versions of the statute, highlighting relevant differences as applicable.

the amended false statement clause "replaced the language of 'false record or statement to get a false or fraudulent claim paid or approved by the government' with 'statement material to a false or fraudulent claim.'"  *Id.* (quoting FERA § 4(a)).  The amended presentment clause applies to conduct occurring on or after May 20, 2009.  FERA § 4(f).  The amended false statement clause applies retroactively to "all claims under the False Claims Act . . . that are pending on or after" June 8, 2008.  *Id.* at § 4(f)(1).

The presentment and false statement clauses are "complementary," having been "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval."  *United States ex rel. Totten v. Bombardier Corp.* (*Totten II*), 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original).  The elements of these claims are that: "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  *United States ex rel. Tran v. Computer Scis. Corp.* (*Tran*), 53 F. Supp. 3d 104, 121–22 (D.D.C. 2014) (citation and alteration omitted).

A false claim can take several forms. "In the case of the 'paradigmatic . . . factually false claim,' a claimant 'submits information that is untrue on its face.'"  *United States ex rel. Morsell v. Symantec Corp.* (*Morsell*), 130 F. Supp. 3d 106, 118–19 (D.D.C. 2015) (quoting *Kellogg Brown & Root Servs.,* 800 F. Supp. 2d 143, 154 (D.D.C. 2011)); *see also United States v. Science Applications Int'l Corp.* (*SAIC*)*,* 626 F.3d 1257, 1266 (D.C. Cir. 2010).  This Circuit also accepts two additional theories of legal "falsity" that are relevant in this case: fraudulent inducement and implied certification.  *See United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,* 393 F.3d 1321, 1326–27 (D.C. Cir. 2005) (addressing "fraud-in-inducement theory of liability under the FCA"); *SAIC*, 626 F.3d at 1266 (discussing Circuit's endorsement of

implied certification theory as basis for FCA claims); *see also Tran*, 53 F. Supp. 3d at 117

(discussing potential bases for liability under the FCA); *U.S. ex rel. Head v. Kane Co.*, 798 F.

Supp. 2d 186, 195–96 (D.D.C. 2011) (noting that FCA claims take several forms, including

fraudulent inducement and implied false certification, and citing *Bettis*, 393 F.3d at 1326; *SAIC*,

626 F.3d at 1266). The fraudulent inducement theory imposes liability "for each claim submitted

to the Government under a contract which was procured by fraud, even in the absence of

evidence that the claims were fraudulent in themselves." *Tran*, 53 F. Supp. 3d 104, 117 (quoting

*Bettis,* 393 F.3d at 1326 (citing S. Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N.

5266, 5274)).

Alternatively, under the implied certification theory of liability, "the falsity of a claim for

payment rests on a false representation of compliance with an applicable federal statute, federal

regulation, or contractual term." *Comstor*, 308 F.Supp. 3d at 79 (quoting *United States ex rel.

McBride v. Halliburton Co.* (*McBride*), 848 F.3d 1027, 1031 (D.C. Cir. 2017)); *see also SAIC*,

626 F.3d at 1266. "[U]nder the implied certification theory, a party can incur liability for

making claims under a contract while 'withh[olding] information about its noncompliance with

material contractual requirements.'" *Morsell*, 130 F. Supp. 3d at 119 (quoting *SAIC*, 626 F. 3d at

1269). However, "in order to establish liability[,] the plaintiff must prove that 'compliance with

the legal requirement in question is *material* to the government's decision to pay.'" *McBride*,

848 F.3d at 1031 (emphasis in original) (quoting *SAIC*, 626 F.3d at 1271). This Circuit has

"committed to 'enforcing this [materiality] requirement rigorously' to 'ensure that government

contractors will not face onerous and unforeseen FCA liability as the result of noncompliance

with any of potentially hundreds of legal requirements established by contract.'" *Id.* (quoting

*SAIC*, 626 F.3d at 1271). The Supreme Court has, furthermore, underscored the need for courts

to be rigorous in their examination of implied certification theories and engage in "strict enforcement of the Act's materiality requirements." *Universal Health Services*, 136 S. Ct. at 2002 (quoting *SAIC*, 626 F.3d at 1270). The same "strict enforcement" applies to the FCA's scienter, or knowledge, requirements. *Id*. "The requisite knowledge has two dimensions: The plaintiff must show that the defendant "knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *Morsell*, 130 F. Supp. 3d at 119–20 (quoting *SAIC*, 626 F.3d at 1271) (citing *Heath,* 791 F.3d at 125).

### 2. "Reverse" False Claim Actions

Relator also brings claims pursuant to the so-called "reverse" false claims clause of the FCA, which addresses "any fraudulent conduct that 'results in no payment to the government when a payment is obligated.'" *Si II*, 71 F. Supp. 3d at 88 (citation omitted). This clause applies to any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The pre-FERA version of this clause imposed civil liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.'" 31 U.S.C. § 3729(a)(7) (2006). The amended version of this clause is broader than the pre-FERA version of the statute in two important ways. First, FERA "expanded the type of conduct underlying a reverse false claim action to include presentment (*i.e.,* making a claim-related submission) as well as a material false statement, thereby mirroring sections 3729(a)(1)(A) and 3729(a)(1)(B)." *Si II*, 71 F. Supp. 3d at 88–89 (citing S. Rep. No. 111–10, at 13–15 (2009)). "Second, it broadened the relevant payment 'obligation.' . . . Whereas the pre-FERA version of the FCA did

not contain any definition of obligation," *id.*, FERA defines obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment," 31 U.S.C. § 3729(b)(3).

### 3. Conspiracy Actions

Additionally, the FCA provides for civil liability for any person who "conspires to commit a violation of" any of the above-described provisions. 31 U.S.C. § 3729(a)(1)(C). The elements of this cause of action are: "(1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *Si II*, 71 F. Supp. 3d at 89 (quoting *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 608 F.3d 871, 899 (D.C. Cir. 2010)). "General civil conspiracy principles apply to FCA conspiracy claims." *Kane*, 798 F. Supp. 2d at 201 (quoting *United States ex rel. Westrick v. Second Chance Body Armor, Inc.* (*Westrick*), 685 F. Supp. 129, 140 (D.D.C. 2010)). Thus, for instance, there must be "some underlying tortious act" for there to be a conspiracy. *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C. Cir. 1983). In the FCA context, then, "there can be no liability for conspiracy where there is no underlying violation of the FCA." *Si II*, 71 F. Supp. 3d at 89 (citing *United States ex rel. Amin v. George Washington Univ.* (*Amin*)*,* 26 F. Supp. 2d 162, 165 (D.D.C. 1998)).

## IV. ANALYSIS

Before turning to Defendant's motions to dismiss, the Court will address two threshold issues: first, the parties' joint motion to dismiss Defendant West Corporation, and second, Defendant Alorica's and Defendant GRSI's arguments concerning parent company liability.

## A. Joint Motion to Dismiss Defendant West Corporation

As mentioned previously, the parties have jointly moved to dismiss with prejudice Relator's claims against Defendant West Corporation, the parent company to prime contractor West Asset Management at the time of the original task order. *See* Joint Mot. Dismiss Claims Against West Corp ("Joint Mot."), ECF No. 77. The parties state that, pursuant to the 2015 Asset Contribution and Equity Purchase Agreement ("Purchase Agreement") entered into by Alorica and West, Alorica "assumed all liabilities of West related to WAM, including any damages, penalties, or other relief, by way of judgment or settlement, that might arise with respect to Relator's claims against West" in this lawsuit;" "purchased and acquired all equity and interests in WAM from West and later renamed it GRSI;" and "agreed to also assume any liabilities, including any damages, penalties, or other relief, by way of judgment or settlement, that might arise as to West based on the allegations set forth in the First Amended Complaint." Dismissal Agreement 1–2, ECF No. 77-1. The parties executed their dismissal agreement on May 14, 2019. *Id.* at 5. The agreement provided that the parties would confer with the U.S. government within ten days of execution, and the parties state that Relator has in fact conferred with government counsel, "who has represented that the United States does not oppose such dismissal." Joint Mot. 1. This uncontested submission establishes that the United States, on behalf of which Relators bring the instant suit, has consented to this dismissal. Thus, the Court grants the motion to dismiss the claims against Defendant West with prejudice with respect to Relator and without prejudice with respect to the U.S. government.

## B. Defendant Alorica/GRSI Parent Company Liability

Defendant Alorica/GRSI raises a further argument related to this corporate restructuring, contending that Relator has not provided any basis to assert liability against WAM's parent

company (formerly West and now Alorica). Alorica/GRSI Mem. P. &. A. Supporting Mot. Dismiss ("Alorica/GRSI Mem.") 42, ECF No. 86. More specifically, Alorica/GRSI argues that Relator has provided no factual allegations that suggest either (1) that the parent company was directly involved with the subsidiary company or (2) that the parent company was an "alter ego" of the subsidiary company. *Id.* at 42–43 (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.* (*Hockett*), 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007)).[13] Relator's opposition does not provide factual allegations to rebut this argument. Instead, PCA Integrity asserts that "the practice of courts in this Circuit is to order discovery to illuminate alter ego disputes before deciding dispositive motions which assert lack of jurisdiction over the alleged alter ego." Relator's Brief in Opp'n to Alorica/GRSI's, Uniquity's, and PRC's Motions to Dismiss ("Opp'n to Alorica/GRSI, Uniquity, and PRC") 33, ECF No. 97 (citing *Richard v. Bell Atl. Corp.*, 946 F. Supp. 54, 64 (D.D.C. 1996); *United Mine Workers of Am. Int'l Union v. Arch Mineral Corp.*, 145 F.R.D. 3, 6–7 (D.D.C. 1992); *Labadie Coal Co. v. Black*, 672 F.2d 92, 98 (D.C. Cir. 1982)). For the following reasons, Defendants have the better argument.

The problem for Relator is the failure to present any facts at all that suggest either the parent company's direct role or that the parent company dominated the actions of the subsidiary company. A court can "pierce the [corporate] veil" and hold a parent company liable for the

---

[13] In addition, Alorica/GRSI suggests that the complaint's use of the name "West Corporation," abbreviated to "West," to refer to the prime contractor in this cluster represents a "failure to clearly identify the entities it is alleging to have committed the fraud." Alorica/GRSI Mem. 42 & n.16. On Relator's account, there is no such descriptive failure; rather, "the Amended Complaint exclusively references West Corporation in the factual allegations for the sake of convenience." Opp'n to Alorica/GRSI, Uniquity, and PRC 34 n.11. Although the Court agrees with Defendants that the initial references to "West" as the prime contractor are less precise than ideal, when the amended complaint is parsed in context, Relator has the better argument. On the Court's read of the pleadings, construing all ambiguities in favor of the pleader, it is apparent that Relator intends to reference WAM as the prime contractor and uses "West" as shorthand.

actions of a subsidiary only where the parent 'so dominated the subsidiary corporation as to negate its separate personality.'" *Hockett*, 498 F. Supp. 2d at 60 (quoting *AGS Int'l Servs. S.A. v. Newmont USA Ltd.,* 346 F. Supp. 2d 64, 89 (D.D.C. 2004) (internal punctuation and quotation omitted)); *cf. Miller*, 608 F.3d at 897 ("Under the alter ego theory, the court may ignore the existence of the corporate form whenever an individual so dominates an organization as in reality to negate its separate personality." (quoting *Founding Church of Scientology of Wash., D. C., Inc. v. Webster*, 802 F.2d 1448, 1452 (D.C. Cir. 1986) (internal quotation marks omitted))). The Circuit has set out "several factors" that are "helpful in deciding when to pierce the corporate veil," grouping them "under a two-prong test: (1) is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?" *Labadie Coal*, 672 F.2d at 96 (footnote omitted).

Under the first prong, a court considers "the degree to which formalities have been followed to maintain a separate corporate identity." *Id.* "To justify piercing the corporate veil between a parent and a subsidiary, the parent's control of the subsidiary must be 'active and substantial, but it need not be exclusive in a hypertechnical or day-to-day sense.'" *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 150–51 (D.D.C. 2010) (quoting *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999); *see also Valley Fin., Inc. v. United States,* 629 F.2d 162, 172 (D.C. Cir. 1980). Although there is no "rigid standard of what constitutes 'active and substantial' control," courts in this Circuit are "to consider the following factors: (1) the nature of the corporate ownership and control; (2) failure to maintain corporate minutes or adequate records; (3) failure to maintain the corporate formalities; (4) a commingling of funds and other assets; (5) diversion of corporate funds or

assets to other uses; and (6) use of the same office or business location." *IMark Mktg. Servs.*, 753 F. Supp. 2d at 150–51 (first quoting *Material Supply Int'l*, 62 F. Supp. 2d at 20, then citing *Labadie Coal*, 672 F.2d at 97–99); *see also United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 25 (D.D.C. 2016).

Under the second prong, a court considers "the basic issue of fairness under the facts." *Labadie Coal*, 672 F.2d at 96 (footnote omitted). This "practical" analysis is "based largely on a reading of the particular factual circumstances," with the "ultimate determination . . . dependent upon the sound discretion of the trial judge." *Valley Fin.*, 629 F.2d at 172. In conducting this analysis, a trial court "should consider the entire picture of the relationship between the two corporations, including the many factors listed in the formalities prong of the test." *Shapiro, Lifschitz & Schram, P.C. v. Hazard* (*Hazard*), 90 F. Supp. 2d 15, 26 (D.D.C. 2000) (quoting *Labadie Coal,* 672 F.2d at 99); *see also IMark Mktg. Servs.*, 753 F. Supp. 2d at 152 (quoting *Hazard,* 90 F. Supp. 2d at 26).

Here, Relator's argument fails at the first prong because PCA Integrity never presents any factual allegations that would allow the Court to conclude that the parent company (formerly West Corporation, now Alorica) exercised "active and substantial" control over the subsidiary (formerly WAM, now GRSI).[14] Instead, Relator appears to assert that this issue is a "factual dispute that is ill-suited to resolution on a motion to dismiss." Opp'n to Alorica/GRSI, Uniquity, and PRC 33. But the two cited district court cases, standing alone, do not establish that it is "the practice of courts in this Circuit" to order discovery when faced with similar facts.[15] *Id.* Nor

---

[14] If anything, the complaint's factual allegations, which indicate that the two entities had different business addresses and managers, cut the other way. *See* Am. Compl. ¶¶ 32–35.

[15] In any event, this persuasive authority is not very persuasive here. In *United Mine Workers*, the motion to dismiss was predicated "largely" on the assertion that the court lacked personal jurisdiction over the parent company with respect to contracts entered into by

does the Court find support for such a routine practice in the Circuit's decision to vacate a decision and order discovery in *Labadie Coal* after conducting a detailed analysis of whether "formalities ha[d] been followed to maintain a separate corporate identity." 672 F.2d at 96, 97–99 (assessing formalities).  At the end of the day, then, Relator neither offers any binding precedent nor any further argumentation beyond the bare statement that it "has pled sufficient facts under either a direct or derivative theory of liability under which West and/or Alorica could be found liable."  Opp'n to Alorica/GRSI, Uniquity, and PRC 34.  This bald assertion is no more than a legal conclusion without factual support, however, and cannot survive the motion to dismiss.[16]  *See Twombly*, 550 U.S. at 555.

## C. Presentment and False Statement Claims

Turning now to the merits of Defendants' motions to dismiss, Defendants argue, *inter alia*, that the presentment and false statement claims that form Count I and Count II, respectively, of the amended complaint, *see* Am. Compl. ¶¶ 324–32, do not plausibly establish a claim for relief with the particularity demanded by Rule 9(b)'s heightened pleading standard.[17]

---

subsidiaries, such that the court needed to "decide questions of corporate structure that implicate[d] the merits of the underlying [contract] claims."  145 F.R.D. at 6–7.  In this suit, the merits of the underlying FCA claims are independent of the question of parent company liability. In *Richard v. Bell Atlantic Corporation*, the court ordered discovery based upon its appraisal of 38 exhibits submitted by the Plaintiffs, some of which "suggest[ed] that it would not be proper . . . to conclude that as a matter of undisputed material fact [the parent corporation] is not the plaintiffs' employer."  946 F. Supp. at 64 (internal quotation marks omitted).  In this suit, Relator has submitted no exhibits or any other evidence (or even allegations) in support of its argument.

[16] Should Relator file an amended complaint, it may add factual allegations that specify (1) in what ways, if any, the parent company directly participated in the alleged activities of the prime contractor subsidiary and/or (2) how the parent company otherwise dominated the subsidiary company in a way that supports piercing the corporate veil between the two entities.

[17] Because, as discussed previously, "presentment claims under § 3729(a)(1)(A) and false statement claims under § 3729(a)(1)(B) follow 'essentially the same legal analysis,'" the Court considers these claims jointly.  *United States ex rel. Hutchins v. DynCorp Int'l, Inc.* (*Hutchins*), 342 F. Supp. 3d 32, 48 (D.D.C. 2018) (quoting *Tran*, 53 F. Supp. 3d at 123).

Defendants also contend that Relator has failed to articulate, with the particularity required, the materiality of any alleged false claim. For the forthcoming reasons, the Court agrees with Defendants on both of these points and grants the motions to dismiss these claims.

1. Lack of Particularity in Pleading Basic Facts[18]

A common thread throughout Defendants' briefings is the contention that Relator did not make sufficiently specific allegations concerning any individual Defendant's presentation of false claims to the government. Put simply, the argument is that Relator failed to allege the who, what, where, and when of the fraud in the manner that Rule 9(b) demands. *See* Def. ConServe's Mem. P. & A. Supporting Mot. Dismiss ("ConServe Mem.") 19, 30–33, ECF No. 91-1 (arguing that "Relator fails to allege the who, what, where, and when of an actual false claim for payment to the government." (emphasis removed)); Protocol Mem. 1, 10–17 (detailing how "[t] he AC fails to describe the content, dates, and other particularized information for critical claims"); Def. State's Mem. P. & A. Supporting Mot. Dismiss ("State Mem.") 17–20, ECF No. 93-1

---

[18] Even so, the Court recognizes that one core distinction between these claims involves what suffices to make the required showing of scienter to establish liability under 31 U.S.C. § 3729(a)(1)(B). The legal standard turns on which version of the FCA—pre-or post-FERA—applies. *See Comstor*, 308 F. Supp. 3d at 91 (FERA 'amend[ed] the FCA to clarify and correct erroneous interpretations of the law' decided in *Allison Engine* [*Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)], including by eliminating the false statement provision's intent requirement."). As the Court explains below, a major deficiency in the amended complaint is the failure to state with particularity the timing of critical factual allegations that pertain to each specific Defendant. The intervening changes in controlling statutes make this omission even more problematic, as Defendant Protocol rightly notes. Def. Protocol's Mem. P. & A. Supporting Mot. Dismiss ("Protocol Mem.") 11, ECF No. 81-1 ("The absence of times figure more prominently in this case due to relevant shifts in the governing law."). Thus, until Relator clarifies the relevant timeline, permitting the Court to draw firmer conclusions concerning what governing law to apply to the pending claims, the Court reserves judgment concerning scienter.

[18] In the forthcoming analysis, the Court at times uses one Defendant to illustrate a particular point. However, unless otherwise indicated, such discussion of a Defendant by way of example does not mean that the issue is not equally applicable to all other similarly-positioned Defendants (e.g., where the Court discusses Edgewater to highlight a point regarding the subcontractor defendants, unless otherwise specified, a version of the issues identified also applies to the other subcontractor defendants).

(describing how "Relator has failed to plead the 'who, what, where, and when' specifics of its FCA claims and has not specified which Counts apply to which defendants"); Def. Pioneer's Mot. Dismiss ("Pioneer Mot.") 31, ECF No. 88 ("[R]elator has not alleged facts identifying a single false claim, false invoice, or false account; the date on which any false claim was submitted to the U.S. government; or who submitted such a claim."); Edgewater Mot. 8–9 (contesting Relator's failure to establish "who, what, when, where, and how" "as it relates to Edgewater"); Bass Mot. 6 (alleging same lack of specificity regarding Bass); Alorica/GRSI Mem. 15–22 ("Throughout the Complaint, rather than plead particularized facts . . . Relator makes general and conclusory assertions without identifying with specificity any false claims by a WAM Defendant, any false record or statement submitted to the Government and attributable to a WAM Defendant, or the actual operation of any fraudulent 'scheme.'"); Def. Uniquity's Reply to Relator's Opp'n Mot. Dismiss ("Uniquity Reply") 1–2, ECF No. 109 ("Relator has utterly failed to plead any facts regarding any supposed false representation made by Uniquity to the ED."); PRC Mot. 3 (attacking lack of specific examples in support of Relator's "generic position").[19]

Though styled as three separate oppositions to the three groups of Defendants, Relator's rebuttal comes down to essentially the same core arguments. First, clarifying that it is pursuing both fraudulent inducement and false certification theories, PCA Integrity alleges that each of the three prime contractors "fraudulently induced the government to enter the initial collection contracts by falsely claiming that they would comply with their subcontracting plans." Relator's Brief in Opp'n to ConServe's, Protocol's[,] and State's Motions to Dismiss ("Opp'n to

---

[19] Defendants Alorica/GRSI and Pioneer, respectively, submitted their memoranda along with an unpaginated motion to dismiss as part of the same filing. *See* ECF Nos. 86, 88. The Court refers to the original page numbers of these documents.

ConServe, Protocol, and State") 26, ECF No. 95; Relator's Brief in Opp'n to Pioneer's, Edgewater's, and Bass's Mot. Dismiss ("Opp'n to Pioneer, Edgewater, and Bass") 27, ECF No. 96; Opp'n to Alorica/GRSI, Uniquity, and PRC 15.[20] Relator contends that, at this stage of litigation, it does not need to "allege the *existence* of a request for payment with particularity," Opp'n to ConServe, Protocol, and State 28 (quoting *United States ex rel. Folliard v. CDW Tech. Servs., Inc.* (*Folliard*), 722 F. Supp. 2d 20, 26–27 (D.D.C. 2010)), or to "plead the contents of any particular claim for payment," Opp'n to Pioneer, Edgewater, and Bass 28; Opp'n to Alorica/GRSI, Uniquity, and PRC 16. With respect to Defendant ConServe, Relator further asserts that it has indicated the timing of the alleged fraudulent inducement by stating that "the PCAs submitted proposals by June 26, 2008, and ED ultimately contracted with 22 PCAs, including ConServe, in the first quarter of 2009." Opp'n to ConServe, Protocol, and State 27. These same fraudulent representations, Relator appears to suggest, amount to implied false certification each time that *any* of the Defendants "made, or caused to be made, false statements regarding the Prime Contractor defendants' compliance with these subcontracting plans." *Id.* at 27–28.

In addition, with respect to Defendants Pioneer and WAM, Relator argues that it has provided sufficient factual allegations to establish that each "defendant fraudulently induced the government to enter into a contract," which is enough to survive Defendants' Rule 12(b)

---

[20] Relator's initial pleading makes allegations about "Defendants" in broad strokes and is not a paragon of clarity regarding which claims and legal theories apply to which parties. Based on the arguments made in Relator's briefs in opposition, which specify that the fraudulent inducement theory applies to the "Prime Contractor Defendants," *see* Opp'n to ConServe, Protocol, and State 26; Opp'n to Pioneer, Edgewater, and Bass 27; Opp'n to Alorica/GRSI, Uniquity, and PRC 15, and which do not make any arguments concerning this theory of liability with respect to any other categories of defendants, the Court concludes that Relator only intends to put forth a fraudulent inducement argument for the prime contractor defendants (ConServe, Pioneer, and WAM).

motions.  Opp'n to Pioneer, Edgewater, and Bass 28 (quoting *United States ex rel. Shemesh v. CA, Inc.* (*Shemesh*), 89 F. Supp. 3d 36, 47 (D.D.C. 2015)); Opp'n to Alorica/GRSI, Uniquity, and PRC 16 (same).  For Defendants Pioneer and WAM, Relator also asserts in a single footnote that it satisfies even the "presentment theory of liability" because Rule 9(b) does not require the relator "to plead representative samples of claims actually submitted to the government."  Opp'n to Pioneer, Edgewater, and Bass 28 n.7 (quoting *Heath*, 791 F.3d at 123); Opp'n to Alorica/GRSI, Uniquity, and PRC 15 n.6 (same).

Second, Relator maintains that the factual allegations provided satisfy Rule 9(b)'s heightened pleading standard, properly construed.  With respect to Defendants ConServe, Protocol, State, Pioneer, Edgewater, and Bass, Relator argues that it has set forth facts that establish "the circumstances *constituting* fraud," and that is enough.  Opp'n to ConServe, Protocol, and State 29 (emphasis in original) (quoting *Folliard*, 722 F. Supp. 2d at 27); Opp'n to Pioneer, Edgewater, and Bass 29 (same).  With respect to Defendants WAM, Uniquity, and PRC, Relator argues that it has set forth sufficient facts to satisfy Rule 9(b) because "[neither] the theory of fraudulent inducement nor the theory of false certification require Relator to plead the contents of any particular claim for payment, as the focus is on Defendants' fraud surrounding any such claim, not the claim itself."  Opp'n to Alorica/GRSI, Uniquity, and PRC 16 (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d , 1166, 1174 (9th Cir. 2006)).  In support of this argument, Relator generally cites back to—for each group of Defendants— its factual allegations in the amended complaint, which it contends substantiate the alleged scheme to claim small business subcontracting credit by falsely certifying that the subcontractor defendant in each group was a small business.

Third, Relator argues that it has in fact established the "who" for its presentment and false statement claims against each category of defendant because it is not alleging individual fraud; rather, it is alleging that each of the entities committed "fraud at the corporate level." Opp'n to ConServe, Protocol, and State 28 (quoting *Heath*, 791 F.3d at 125); Opp'n to Pioneer, Edgewater, and Bass 29 (same); Opp'n to Alorica/GRSI, Uniquity, and PRC 16 (same). PCA Integrity argues that its factual allegations plausibly suggest such corporate-level malfeasance. *See* Opp'n to ConServ, Protocol, and State 29 ("Relator has sufficiently alleged that Defendants' claims were false because Defendants sought payments, including bonuses and additional task orders, by falsely certifying that legitimate small businesses were providing subcontracting services to the federal government."); Opp'n to Pioneer, Edgewater, and Bass 29 (asserting that Relator need not identify specific individuals at the companies to advance such a theory); Opp'n to Alorica/GRSI, Uniquity, and PRC 16 (same).

Relator's arguments fill many pages, yet on the facts presented, ultimately prove unavailing on both the fraudulent inducement and implied certification fronts. To sustain either of these claims, Rule 9(b) requires the pleader in an FCA fraud action to, "at a minimum, . . . state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud' and 'individuals allegedly involved in the fraud.'" *Si II*, 71 F. Supp. 3d at 85 (quoting *Williams*, 389 F.3d at 1256). Here, despite Relator's contrary contentions, PCA Integrity's pleading does not establish with the requisite particularity the time and place of the false misrepresentations, what constitutes the allegedly false claim for each discrete defendant, and what, precisely, "was retained or given up as a consequence of the fraud." *Williams*, 389 F.3d at 1256. The Court next considers what, more

specifically, is lacking under the fraudulent inducement and implied false certification theories that Relator advances.

### a. Fraudulent Inducement Theory

Taking Relator's fraudulent inducement theory claim first, PCA Integrity paints a general picture of a scheme wherein a prime contractor defendant submitted a subcontracting agreement that falsely represented an intention to subcontract with small businesses. *See, e.g.*, Opp'n to ConServe, Protocol, and State 26. Again, the fraudulent inducement theory imposes liability "for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *Tran*, 53 F. Supp. 3d 104, 117 (quoting *Bettis*, 393 F.3d at 1326) (citing S. Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274).

In this case, the trouble for Relator is the failure to connect several critical dots in the alleged scheme, leaving the Court unclear as to what, precisely, was allegedly actionably false and/or fraudulent. The first fundamental issue involves the terms of the agreement with ED under the operative task order. At bottom, PCA Integrity's allegations turn on a direct link between the subcontracting plan and the fraud, based on the terms of ED's contract with the prime contractors. But Realtor does not establish, with particularity, that any of the prime contractors were *required* to hire any small businesses at all in order to obtain a contract with ED. The closest Relator comes is the statement that "ED ultimately contracted with 22 PCAs: 17 large ('unrestricted') PCAs and five small ('set-aside') PCAs." Compl. ¶ 52. The fact that ED contracted with some small PCAs does little to advance PCA Integrity's case, though. Missing are any particularized factual allegations establishing that, without a given prime contractor's alleged fraudulent misrepresentation at the time of contracting that it would hire small

businesses, that prime contractor could not have received a contract with ED.  And without more specificity, Relator's claims are easily distinguished from a case in which, say, a set-aside contract was reserved exclusively for a small business enterprise and a company misrepresented its size to obtain a fraudulently-induced contract.

Instead of directly pleading such factual allegations with respect to each prime contractor defendant, Relator gestures towards Defendants' incentive structures.  *See* Am. Compl. ¶ 7 ("Under the ED PCA task orders at issue in this case, PCAs were incentivized to subcontract no less than 10% of their work to small business concerns."); *id.* ¶¶ 53–60 (describing incentives in general terms).  But if such an incentive structure forms the basis for the alleged fraud, a lack of particularity again plagues PCA Integrity's pleading.  On the Court's best read of the factual allegations, Relator relies on the following causal chain: given that (1) "ED PCA contracts are performance-based and highly competitive," *id.* ¶ 52, and a contracting party can gain extra points in the CPCS ranking system that ED uses to award bonuses and extensions, *id.* ¶¶ 53–54, (2) the incentive of a five-point bonus awarded to "a PCA that satisfied ED's small business subcontracting target," *id.* ¶ 55, (3) led the prime contractor defendants to misrepresent their size in order to obtain the five-point bonus and thereby receive further awards or consideration, *id.* ¶¶ 10–11.  Beyond sketching out this alleged scheme at a high level, however, Relator never indicates what particular preferences were given to each prime contractor defendant in return for a promise to meet the subcontracting target.[21]  Nor, assuming for the sake of argument that certain (unspecified) preferences were awarded to certain (unspecified) Defendants, does Relator

---

[21] Even for Defendant ConServe, which Relator alleges "received a two-year award extension" as a result of its "false and/or fraudulent representations and conduct," Am. Compl. ¶ 11, PCA Integrity does not link ConServe's alleged initial misrepresentation to the extension. Without far more detail to suggest that ConsServe received a five-point bonus as a result of its initial representation to ED with respect to Protocol, and that this added component of its CPCS score led ED to extend its award, Relator has not satisfied its pleading burden.

indicate that an initial statement at the time that the subcontracting agreement was submitted was the reason *why* those parties received those preferences. Without more, the Court is left in the dark regarding how, exactly, the prime contractors' initial agreements with ED represent statements that fraudulently induced the government to pay out claims.

This issue is compounded by the utter lack of information about what promises, if any, were made in the subcontracting plan that is at the core of Relator's alleged scheme, and what subsequent claims, if any, were purportedly false. The complaint never says anything at all about the subcontracting plan beyond the bare fact that it was submitted to ED. This information is lacking at even a high level, not to mention at the level of detail that Rule 9(b) demands. What if, for instance, a prime contractor defendant initially promised a particular small business subcontracting target of 10%, exceeded this pledge by subcontracting 20% of its overall business to qualified small businesses, and then it turned out that a subcontractor accounting for 5% of overall business was not in fact small—would this amount to fraud? And what is the response of the relevant government entities (ED and the Small Business Administration) in the mine run of cases? Relator does not say. Moreover, based on Relator's pleading and taking as true the allegation that the small business subcontracting targets were approximately 10% during the relevant time period, Am. Compl. ¶ 55, it appears in most instances that the prime contractor bills ED for work performed by subcontractors that are not small. Relator never explains whether, after submission of the initial subcontracting plan, each prime contractor's bills to ED indicate that any of the subcontracted work was performed by any small businesses. But because it has omitted any information on this point, Relator has failed to establish that any such claims are, in fact, false at all. Without far more facts concerning the subcontracting plan and promises made therein, subsequent billing submissions for each prime contractor, and any rewards a

contractor received as a result of meeting or exceeding the goals set forth in the initial subcontracting plan, the Court cannot determine what, if anything, provides the legal foundation for Relator's allegations of falsity under its fraudulent inducement theory of relief.

Thus, the Court is left without any factual allegations to support the contention that ConServe, Pioneer, or WAM, respectively, acted fraudulently or violated an applicable regulation at the time of submission of the purportedly false claim. *See* ConServe Mem. 2 (explaining that Relator has failed to establish that ConServe knew that Protocol was not a qualifying small business at the time it submitted the subcontracting plan); Def. Pioneer's Reply Supporting Mot. Dismiss ("Pioneer Reply") 7, ECF No. 106 (explaining that Pioneer cannot possibly have made a fraudulent inducement by submitting a small business subcontracting plan in 2008 when it did not learn that Bass no longer qualified until 2009 or 2010); Alorica/GRSI Reply 10 (explaining that Uniquity did not exist until 2011, two years after the original 2009 ED task order). In fact, without knowing what the prime contractors promised at the inception, it is impossible to infer that *any* false claims were made at *any* point. Accordingly, PCA Integrity has not set forth a plausible claim for relief under a fraudulent inducement theory of liability—let alone a claim sufficient to meet Rule 9(b)'s heightened pleading standard.

### b. *Implied False Certification Theory*

Turning now to PCA Integrity's implied false certification theory of liability, such a theory applies when an entity has made "a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Comstor*, 308 F.Supp. 3d at 79 (quoting *United States ex rel. McBride v. Halliburton Co.* (*McBride*), 848 F.3d 1027, 1031 (D.C. Cir. 2017)); *see also SAIC*, 626 F.3d at 1266.

Here, Relator's arguments fall short because Relator misrepresents and muddles what is required to allege a cognizable claim under controlling law.  Even if Relator does not need to "allege the existence of a request for payment for particularity," PCA Integrity must plead with particularity "the circumstances constituting fraud."  *Folliard*, 722 F. Supp. 2d at 26–27 (emphasis removed) (first quoting *United States ex rel. Davis v. District of Columbia*, 591 F.Supp.2d 30, 37 (D.D.C. 2008), then quoting Fed. R. Civ. P. 9(b)).  And again, this pleading must satisfy the Rule 9(b) particularity standard by providing each Defendant with "notice of the who, what, when, where, and how with respect to the circumstances of the fraud."  *Tran*, 53 F. Supp. 3d at 123.  Without these details, pled with the particularity that Rule 9(b) requires, the Court cannot determine whether liability for fraudulent claims for payment properly attaches.  For the following reasons, PCA Integrity has not said enough to establish a claim for relief.[22]

The core deficiency is straightforward: the face of the pleading does not establish "where" or "when" the allegedly false claims occurred.  For prime contractor defendants ConServe, Pioneer, and WAM, the only indication of "where" requires multiple levels of inference to discern that misleading or fraudulent statements were submitted to ED as part of small business subcontracting plans, ostensibly in Washington, DC (though this is left implicit in the amended complaint).  Am. Compl. ¶¶ 132–36 (discussing ConServe); 195–99 (discussing WAM); 237–42 (discussing Pioneer).  No additional detail is provided that could elucidate the location of these submissions or any other fraudulent claims or misrepresentations made or caused to be made by the prime contractor defendants.  Relator's opposition briefs do not, moreover, connect up other factual allegations to the subcontracting plans.  As the Court just discussed, Relator says next to nothing at all about the subcontracting plans or the promises

_____

[22] As noted previously, Relator must also establish materiality with the particularity required to satisfy Rule 9(b).  The Court discusses materiality *infra* Section IV.C.2.

allegedly contained therein.  Instead, Relator again insists that PCA Integrity need not identify any specific false claims for payment to survive Defendants' motions to dismiss.  *See* Opp'n to ConServe, Protocol, and State 28; Opp'n to Pioneer, Edgewater, and Bass 28; Opp'n to Alorica/GRSI, Uniquity, and PRC 16.  Without more to identify the circumstances concerning the alleged fraud, however, all that the Court has are legal conclusions couched as factual allegations—far short of what Rule 12(b)(6), let alone Rule 9(b), demands.  *See Twombly*, 550 U.S. at 555.

This lack of clarity concerning what, exactly, the prime contractors are alleged to have done, and where they did it, is especially problematic because PCA Integrity also fails to clarify when the actions occurred.  Relator states that ED issued the original PCA solicitation on May 29, 2008, Am. Compl. ¶ 52, that interested companies submitted proposals by June 26, 2008, *id.* and that "[t]he first transfer of accounts under this contract occurred in the first quarter of 2009," *id.*, with the task orders pertaining to unrestricted PCAs concluded in late April 2015, *id.* ¶ 60. Left unsaid, however, is when the subcontracting plan was submitted and when, if ever, the prime contractor defendants made any further fraudulent misrepresentations.  This specificity concerning the circumstances of the alleged fraud is essential because the FCA "attaches liability, not to underlying fraudulent activity, but to the claim for payment."  *Totten I*, 286 F.3d at 551 (internal quotation marks and citation omitted) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)).  The Court can vaguely infer, based on the alleged facts, that they must have been submitted at some point between June 2008 (when ED issued its solicitation) and the first quarter of 2009 (when the first transfer occurred); if not, then ostensibly, the first transfer would not have taken place.  But Rule 9(b) requires more than such

attenuated inferences.  Because Relator has failed to provide more for the prime contractor defendants, its pleading does not clear the particularity bar.[23]

Though Relator offers comparatively more for the subcontractor defendants, PCA Integrity's pleading still comes up short.  For the subcontractor defendants, Relator's implied certification theory rests on the assertion that "each Subcontractor defendant self-certified that it was a small business in order to gain subcontract opportunities."  Am. Compl. ¶ 15.  Consider, by way of example, Defendant Protocol.  PCA Integrity alleges that Protocol submitted annual self-certifications to the SBA attesting to its small business status and last submitted a certification in 2014, *id.* ¶ 186–87, yet Relator does not offer any additional discussion of the self-certifications.  PCA Integrity defends its factual allegations as sufficient, contending that this suit is distinct from those such as *Si II*, wherein the "plaintiff was unable to identify any details about the contents of certification."  Opp'n to ConServe, Protocol, and State 36 (citing 71 F. Supp. 3d at 94).  "In contrast," Relator argues, "the Amended Complaint alleges numerous times that Protocol's self-certification contained the false representation that it was both a small business and a WOSB," such as the August 2011 statement by Protocol's Tracy Dudek assuring "ConServe that Protocol was registered in the government database as a self-certified small business."  *Id.* (citing Am. Compl. ¶¶ 179, 186–88).

But for Protocol and for all of the subcontractor defendants, PCA Integrity's analysis speeds right past the operative legal principle: the need to plead, with particularity, the

_____

[23] Moreover, as the Court suggested previously and discusses with respect to the public disclosure bar *infra* Part IV.E, the specific timing is even more important here because of intervening changes in the underlying substantive law.  Without clarity about the alleged dates of the conduct, Defendants are left without the ability to discern which legal standards govern Relator's allegations.  *Cf. Si II*, 71 F. Supp. 3d at 85 (quoting *McCready*, 251 F. Supp. 2d at 116) (noting that Rule 9(b)'s application in FCA suits "ensure[s] that defendants have adequate notice of the charges against them to prepare a defense").

circumstances surrounding false claims that the Defendant made or caused to be made to the government. Relator repeatedly insists that it has provided what Rule 9(b) demands, reiterating versions of the theory that this Court "should 'hesitate to dismiss'" its "complaint under Rule 9(b)" if it "is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Opp'n to ConServe, Protocol, and State 7 (quoting *Kane*, 798 F. Supp. 2d at 193); *see id.* at 6–8; Opp'n to Alorica/GRSI, Uniquity, and PRC 15 n.6 ("[T]his Circuit has made clear that . . . [the relator] is not required 'to plead representative samples of the claims actually submitted to the government.'" (quoting *Heath*, 791 F.3d at 126)). But Relator is mistaken: information about the particular circumstances at issue is lacking here. Consider Protocol once more, by way of example. PCA Integrity never explains, let alone with any particularity, how the 2011 statement, the 2014 certification, or any other alleged self-certification meant that either Protocol or any other subcontractor defendant "knowingly present[ed], or cause[d] to be presented, a false or fraudulent *claim for payment or approval*," in contravention of 31 U.S.C. § 3729(a)(1)(A) (emphasis added). If, as explained above, PCA Integrity has failed to indicate which, if any, of the contractor defendants' claims for payment were false, it has likewise failed to show how the subcontractor defendants caused false claims to be presented by the contractor defendants (PCA Integrity does not seem to allege that the subcontractor defendants themselves submitted any claims for payment to ED).

Nor does PCA Integrity explain, with particularity, how the alleged self-certifications indicate that the subcontractor defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim," in violation of 31 U.S.C. § 3729(a)(1)(B). On the Court's best read of the sprawling amended complaint and subsequent

filings, Relator's theory appears to be that each of the subcontractors made fraudulent self-certifications because the subcontractors knew at the time of the self-certifications that they did not comply with the controlling size rules for small businesses, yet represented that they did. *See, e.g.*, Am. Compl. ¶¶ 133 (discussing Protocol's "false misrepresentations" that it was an eligible small business), 184–89 (discussing Protocol's self-certifications that it was a small business despite its relationship with State). But the pages that all parties fill addressing possible affiliation are a sideshow in this context.[24] The salient and antecedent Rule 9(b) point is that Relator has not discussed the purported self-certifications themselves with adequate particularity, especially when it comes to specifying the timing of each (which matters all the more because the underlying NCAIS size threshold changed over time). What information did each self-certification contain, and which aspects of it, specifically, were false? And how did the subcontractors' self-certifications relate to the claims for payment made by the contractors to ED? Once again, Relator does not specify. Nor does PCA Integrity identify, beyond mentioning

---

[24] The Court does not imply that the substantial ink spilled by Relator and Defendants alike in addressing affiliation is unimportant in the final disposition of the suit. However, at this juncture, it is not necessary to address these points because there is an even more basic problem: the lack of required specificity concerning the allegedly fraudulent circumstances under which the affiliation arguments arise. By way of analogy, if one seeks to determine whether or not a description of the sun as dim has enough particularity to conclude that it refers to dawn and not dusk, then it would be premature to engage in a fact-intensive inquiry to determine whether 5:00 and 8:45 AM are both early morning hours. Here, the Court finds there to be a lack of particularity concerning the first issue: whether the facts allege, to the degree required by the applicable pleading standard, enough about the basic conditions to discern whether it is dawn or dusk. For the reasons articulated at length in the body of this memorandum opinion, Relator has not done so. PCA Integrity does not substantiate its claims with concrete, factual allegations that establish organization-wide actions taken to execute the alleged fraud within each defendant entity, ideally connecting these allegations to one or two examples of a claim that the defendant submitted, stated, or caused to be submitted or stated. *See Heath*, 791 F.3d at 126 (finding pleading adequate where plaintiff did not identify details about specific payments, but did "provide[] factual specificity concerning the type of fraud, how it was implemented, and the training materials used, all of which [wa]s then corroborated by the concrete example of . . . [a] Detroit audit documenting the very type of overbilling that follows the complaint's pattern"). Until this pleading requirement is satisfied, the Court reserves judgment concerning affiliation.

self-certifications and making vague references to the prime contractors' associated "requests for payment," *id.* ¶ 193, any other allegedly problematic claims on which its implied false certification theory rests, not to mention any indication of "substantial prediscovery evidence" of facts, *Kane*, 798 F. Supp. 2d at 193, to substantiate any such allegations.

The lack of adequate factual allegations to satisfy Rule 9(b), moreover, do not end there. By way of further illustration, consider Edgewater. For this subcontractor, Relator again relies on the same conclusory legal assertions to back up its factual allegations, without even attempting to connect the dots between the facts in the pleading and the alleged false claims. *See* Opp'n to Pioneer, Edgewater, and Bass 28–29. These bare conclusory statements do not suffice to establish how Edgewater made "claims under a contract while 'withh[olding] information about its noncompliance with material contractual requirements.'" *Morsell*, 130 F. Supp. 3d at 119 (quoting *SAIC*, 626 F.3d at 1269). Accordingly, without more specification regarding each of the alleged self-certifications, when it was made, what discrete issue or issues each problematic self-certification misrepresented, and what relationship such alleged misrepresentation had to the claims for payment submitted by the contractor defendants, Relator has not discharged its pleading burden for Protocol, Edgewater, or Uniquity.

Versions of these same issues recur, moreover, for the allegedly-affiliated defendants. For example, consider Bass. Relator states a number of factual allegations—but not one of them clarifies how, on PCA Integrity's theory, *Bass* made claims to the government at all, or how it caused Pioneer to submit false claims for payment to ED. As Bass puts the point, "Relator has not identified a single false claim, nor any particular false invoice, nor any particular false amount," nor "the date on which any supposed false claim was submitted to the U.S. government, who it was submitted by, or who caused it to be submitted." Bass Mot. 6. This

omission is fatal to Relator's allegations.  And it recurs for every one of the allegedly-affiliated defendants.  Under this Circuit's controlling law, an "'implied false certification' occurs '[w]hen . . . a defendant makes representations *in submitting a claim* but omits its violations of statutory, regulatory, or contractual requirements." *McBride*, 848 F.3d at 1031 (alteration in original) (emphasis added) (quoting *Universal Health Services*, 136 S. Ct. at 1999); *see also Comstor*, 308 F. Supp. 3d at 79.  Without any facts alleging how any allegedly-affiliated defendant submitted a claim or caused such a claim to be submitted, Relator has not established a plausible claim for relief as required by Rule 12(b)(6) or Rule 9(b).[25]

2. Failure to Plead Facts Sufficient to Meet the FCA's Materiality Standard

Relator's claim also falls short because the pleading does not establish the FCA's requirement of materiality with the particularity that Rule 9(b) demands.[26]  *See Universal Health Services*, 136 S. Ct. at 2004 n.6.  In approaching this issue, the Court bears in mind the need to police the materiality requirement "rigorously."  *McBride*, 848 F.3d at 1031 (quoting *SAIC*, 626

---

[25] Given these glaring deficiencies and the lack of required detail concerning materiality, which the Court discusses next, the Court need not consider Defendants' arguments that Relator does not make sufficiently clear "who" is behind the alleged fraud to conclude that PCA Integrity has not stated, with particularity, its claims for relief.  That said, should Relator file an amended complaint, it should take care to specify how each entity institutionalized a unified scheme in which "corporate levers were pulled," *Heath*, 791 F.3d at 125, to perpetrate the alleged fraudulent conduct.  This specificity should detail both (1) which individuals took action within each distinct corporate entity, and how these actions relate to the particular allegations of fraud, and (2) which factual allegations relate to which charges against which Defendant(s), rather than incorporating all facts by reference with respect to all Defendants.

[26] As the Court discusses, the parties rely extensively on *Universal Health Services*, 136 S. Ct. 1989, in raising materiality arguments.  In *Universal Health Services*, the Supreme Court assumed that the post-FERA version of the law applied, notwithstanding the fact that some of the claims at issue were submitted before the 2009 amendment to the FCA.  *Id.* at 1998 n.1.  In *McBride*, this Circuit addressed claims brought under the pre-FERA version of the FCA and assumed, as the parties had done, that the same standard articulated in *Universal Health Services* applied to the dispute at hand.  848 F.3d at 1031 n.5.  Here, as in *McBride*, the parties do not argue that the *Universal Health Services* standard does not apply to any disputed conduct.  Thus, the Court assumes that the materiality requirements are the same under either the pre- and post-FERA versions of the statute.

F.3d at 1271); *Universal Health Services*, 136 S. Ct. at 2002 (quoting *SAIC*, 626 F.3d at 1270) (emphasizing, particularly in the context of implied certification theories of liability, the need for "strict enforcement of the Act's materiality requirements"). For the forthcoming reasons, the deficiencies concerning materiality present another reason to dismiss Relator's claims. Because of the fact-bound nature of the demanding materiality inquiry, *cf. Universal Health Services*, 136 S. Ct. at 2004 n.6, the Court's discussion focuses on two Defendants, Uniquity and PRC. That said, the discussion of these parties should not be taken as a sign that the pleading passes muster with respect to the other Defendants. To the contrary, the issues discussed apply more generally, too, and the pleading falters on materiality grounds for all Defendants.

*a. Defendant Uniquity*

The parties clash over the proper application of the Supreme Court's *Universal Health Services* precedent, with each contending that it should clearly prevail on a proper application of controlling law. The *Universal Health Services* Court affirmed that "the implied false certification theory can be a basis for liability . . . when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement[] [and] . . . the omission renders those representations misleading." 136 S. Ct. at 1995. It further clarified that whether the legal requirements at issue were "expressly designated as conditions of payment" is not dispositive in any consideration of materiality. *Id*. at 1996. Rather, under the "demanding" materiality standard, "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id*. at 2003. Extrapolating from this principle,

the converse applies with equal force: the government's payment of "a particular claim in full despite its actual knowledge that certain requirements were violated" provides "very strong evidence that those requirements are not material," as does regular payment of "a particular type of claim in full despite actual knowledge that certain requirements were violated," without signaling any "change in position." *Id*. at 2003–04.

Relying heavily on this precedent, Uniquity argues that PCA Integrity has failed to "plead that the false self-certification" representing its size, which it most recently submitted in 2013, Am. Compl. ¶ 230,[27] "was material to the government's decision to make payments under the [ED] subcontract." Def. Uniquity's Mem. P. & A. Supporting Mot. Dismiss ("Uniquity Mem.") 14, ECF No. 89-1. More specifically, Uniquity asserts that Relator has failed to (1) plead "any express provision as a condition of payment;" *id.*; (2) establish that the government declines to pay claims for a self-certification violation of the type alleged, *id.* at 15; (3) say anything about "[w]hether the . . . [government] paid Uniquity despite knowing" the alleged facts, *id.* at 16; or (4) indicate any change in government position during the nearly four years that the action has been pending, *id.* at 17.

Relator, unsurprisingly, sees materiality rather differently. *See, e.g.*, Opp'n to Alorica/GRSI, Uniquity, and PRC 17–25. At the outset, PCA Integrity stresses that the materiality inquiry asks "whether the conduct has 'a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property," *id.* at 17 (quoting *Universal Health Services*, 136 S. Ct. at 2002). This standard, Relator asserts, is "far lower than but-for causation,

---

[27] The Court takes the factual allegations in the amended complaint to be true and thus accepts the statement that Uniquity, at a minimum, submitted an annual self-certification in 2013. Am. Compl. ¶ 230. However, because Relator refers to "self-certifications," *id.* ¶ 231, without stating the years of these submissions, the Court is left uncertain as to whether Relator alleges self-certifications in other years.

or even a preponderance of the evidence that the government's decision to pay would be different." *Id.* at 18. After recounting the *Universal Health Services* factors and noting that a court is to consider whether "the requirements at issue go to 'the very essence of the bargain'" along with the other enumerated factors as part of a "holistic approach to determining materiality," PCA Integrity argues that all of the factors cut in its favor. *Id.* (first quoting *Universal Health Services*, 136 S. Ct. at 2003 n.5, then quoting *Comstor*, 308 F. Supp. 3d at 85).

Relator builds up this holistic case in several parts. First, Relator highlights the factual allegation "that the contracts at issue state that a . . . subcontractor's failure to comply in good faith with a subcontracting plan . . . constitutes a 'material breach of the contract." *Id.* at 18–19 (quoting Am. Compl. ¶ 80). Second, Relator points to the further factual allegation "that, in 2018, ED canceled the procurement at issue, 'in part because it had learned of Defendants' widespread small business fraud that had tainted its original task orders.'" *Id.* at 19 (quoting Am. Compl. ¶ 62). Third, Relator contends that these "small-business subcontracting requirements went to the heart of the bargain" because compliance with them "was the sole factor in determining whether Defendants were entitled to incentive payments" and the subcontracting plans "are material parts of the contracts at issue." *Id.* Finally, Relator distinguishes its suit from those that have assessed government knowledge by disputing that the government "has ever had actual knowledge of Defendants' wrongdoing," as opposed to "mere allegations of wrongdoing." *Id.* at 19, 22–23. Relator adds, moreover, that the government's decision not to intervene is "irrelevant" to the materiality inquiry. *Id.* at 22.

Despite Relator's multiple pages of arguments, Defendants have the upper hand in the materiality debate. The basic problem is that, yet again, Relator fails to provide factual allegations to substantiate what, precisely, about the alleged conduct of the prime contractor and

subcontractor is "material" in the sense contemplated by the FCA. Even taking the factual

allegations in Relator's pleading to be true, and even accepting that a subcontracting plan by a

prime contractor (such as WAM) that is never described in any detail implicates a subcontractor

(such as Uniquity) in some fashion, it remains unclear how a "material breach of" the

subcontracting plan that was incorporated into ED's contract with the prime contractor, *see*

Opp'n to Alorica/GRSI, Uniquity, and PRC 18–19, amounts to a condition of payment for the

subcontractor. Relator does not connect these dots, nor does it explain with any specificity how

the subcontractor self-certifications were a "misrepresentation" that was "material" to ED's

"course of action." *Universal Health Services*, 136 S. Ct. at 2001. Instead, PCA Integrity

reasserts the same theory of liability, devoid of factual particulars: it is not claiming that the

subcontractor is "subject to liability merely for violating any statutory or regulatory provision,"

but rather "alleg[ing] that Defendants fraudulently induced the government to enter into contracts

based on their misrepresentations regarding the subcontractor's size, and that Defendants falsely

certified that they had complied with certain contractual and legal requirements."[28] Opp'n to

Alorica/GRSI, Uniquity, and PRC 23–24. Without more, PCA Integrity's claims amount to little

more than the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements," that are insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S.

at 678.

Additionally, Relator does not allege that the government "consistently refuses to pay

claims in the mine run of cases based on noncompliance with the particular statutory, regulatory,

or contractual requirement." *Universal Health Services*, 136 S. Ct. at 2003. There are no factual

---

[28] Relator's use of "Defendants," rather than targeted reference to facts and claims that involve Defendant Uniquity, underscores the issue. Relator does not clarify, here or elsewhere, how the fraudulent inducement argument that its pleading applied to the prime contractor defendants would be salient with respect to the other categories of defendants.

allegations from which to draw the conclusion that the government has declined to pay this category of claim after evidence of noncompliance, nor is there any indication that any specific claims caused to be submitted by Uniquity or by any other subcontractor defendant were not paid in full despite alleged noncompliance with an (unspecified) express or implicit legal requirement imposed on WAM or on any other contractor defendant.[29]  Rather than present such factual allegations, PCA Integrity appears to contend that such factual substantiation does not exist here because the government did not ever possess "actual knowledge of Defendants' wrongdoing." Opp'n to Alorica/GRSI, Uniquity, and PRC 22.  In other words, on the Court's best read of Relator's argument, PCA Integrity asserts that it could not possibly provide factual allegations that the government has not paid "claims in the mine run of cases based on noncompliance," *Universal Health Services*, 136 S. Ct. at 2003, because the government would have needed to actually have known about Defendants' wrongdoing, and here, the government only had "mere allegations" of noncompliance. *Id.* ("[M]ere awareness of allegations concerning noncompliance . . . is different from knowledge of actual noncompliance." (quoting *Universal Health Servs. v. Escobar*, 842 F.3d 103, 112 (1st Cir. 2016) (emphasis removed) (on remand from Supreme Court))).  Putting to the side the fact that Relator does not cite a single in-circuit case to support this "actual knowledge" standard, *see id.* at 22–23, PCA Integrity's actual knowledge argument

---

[29] In addressing this point, the Court notes that Uniquity's briefings refer to the Small Business Association and not to ED or to the government more generally.  Relator raises a valid point by pushing back on Uniquity's reliance on the Small Business Association's relevance here; as PCA Integrity rightly observes, "ED, not the SBA, issued the task orders at issue and paid Defendants," making it the relevant contracting agency.  Opp'n to Alorica/GRSI, Uniquity, and PRC 25.  But even without taking any of Uniquity's arguments concerning the Small Business Association into account, Relator fails to provide any factual allegations to suggest that ED "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Universal Health Services*, 136 S. Ct. at 2003.  Combined with the other gaps identified here, this lack of substantiating facts means that Relator does not establish the materiality required to make out a claim for relief.

betrays a subtle skewing of *Universal Health Services*'s directives. The point is not that the government necessarily needed to have actual knowledge of alleged wrongdoing, but rather that factual allegations indicating that "'the Government pays [or refuses to pay] a particular claim in full despite its actual knowledge that certain requirements were violated,' or 'regularly pays [or refuses to pay] a particular type of claim in full despite actual knowledge that certain requirements were violated,'" can speak to "the materiality of 'the particular statutory, regulatory, or contractual requirement' underlying the relator's claims." *Comstor*, 308 F. Supp. 3d at 87 (quoting *Universal Health Services*, 136 S. Ct. at 2003–04). These considerations are part of the holistic analysis. Rather than provide factual allegations as part of this holistic analysis, though, Relator invokes its "actual knowledge" argument—which, as the Court just discussed, falls flat.

Thus, the bottom line is that Relator has not provided particularized factual allegations regarding the indicia of materiality. The issues include, but are not limited to, the lack of specific support regarding the government's non-payment of similar claims and the lack of clarity concerning what Uniquity's "express condition of payment" is in the first instance. Even taking as true Relator's allegation that ED cancelled contracts in 2018 based in part on the "taint" of the type of conduct alleged here, this stand-alone, bald allegation does not provide factual support to clarify what acts or omissions by Uniquity were likely to have led the government to refuse to pay Uniquity (or WAM) under the original ED contract. Accordingly, Relator has failed to provide enough to establish materiality under the FCA's demanding standard for this element of a claim for relief.

### b. Defendant PRC

By way of further illustration, substantially the same is true for allegedly-affiliated defendant PRC (and for all of the other allegedly-affiliated defendants, as this Court noted previously). PRC raises a series of discrete points to argue that Relator's pleading lacks the requisite factual allegations to establish materiality. PRC argues, specifically, that Relator fails to provide any factual allegations to establish (1) how "Uniquity's misrepresented self-certifications resulted in monies paid that the government would not have paid had the misrepresentations been known," Def. PRC's Mem. P. & A. Supporting Mot. Dismiss ("PRC Mem.") 33 (citing Am. Compl. ¶¶ 231–32), ECF No. 79-1; (2) why the government would have cared about the alleged misrepresentation so long as the collections were performed, given that the contracted services at issue were "performance based," *id.* (quoting Am. Compl. ¶ 53); (3) that "Uniquity was the only small business concern subcontracted by [WAM] to provide services," such that WAM violated anything in its subcontracting terms," or that WAM was even contractually bound to contract with *any* small businesses at all, *id.* at 34; and (4) that "Uniquity would not have received the subcontract were it not a small business concern," *id.* Rather than directly engage with any of these contentions, Relator once more offers conclusory statements that these assertions are not appropriate considerations for a materiality analysis at the motion to dismiss stage. *See* Opp'n to Alorica/GRSI, Uniquity, and PRC 24 ("To the extent these arguments are relevant, they go to the issue of damages, not materiality."); *id.* ("This contention merely disputes the allegations set forth in the Amended Complaint, which is inappropriate on a motion to dismiss.").

But Relator's attempt to write off these allegations as unsuitable at this procedural stage is contrary to controlling law. The materiality inquiry is not merely suitable for disposition at

this stage; it is in fact a required part of the Court's analysis of whether Relator has stated a claim for relief under the FCA. *Universal Health Services*, 136 S. Ct. at 2004 n.6 ("False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality."). Despite Relator's contentions, the issue facing the Court is not whether the specific factual allegations are true. Rather, what this Court must determine is whether there are any factual allegations sufficient to suggest that the alleged misrepresentation was material in the sense that it would have affected the government's decision to pay PRC (or WAM). As discussed previously, Relator has not provided sufficient factual allegations, and PCA Integrity's conclusory assertion that the bare pleading suffices to establish materiality is unavailing.

In addition, the pleading also fails to provide factual allegations that speak to the final *Universal Health Services* factor: whether the government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated." 136 S. Ct. at 2003–04. In fact, the filings before the Court suggest that this factor cuts against Relator. As PCA points out, the Small Business Administration has stated in the Federal Register that, out of 137 firms that misrepresented themselves as "being small for purposes of federal procurement opportunities," it was "unaware of any firms being penalized" under the relevant statute—15 U.S.C. § 645(d)—for this "fraudulent[] misrepresentati[on]." PRC Mem. 34–35 (quoting 80 FR 7533-01, 735 (2015)) (emphasis removed). As PRC explains, citing to Relator's pleading, the clearest basis for Relator's allegations concerning "the illegality and seriousness of submitting false certifications is premised upon 15 U.S.C. § 645." PRC Reply Supporting Mot. Dismiss 11, ECF No. 107 (citing Am. Compl. ¶¶ 79, 122, 123, 229). Logically, if the government has not penalized firms for violations of this requirement, then it follows that it paid the firms despite

their fraudulent misrepresentations and did not consider these misrepresentations material.  *See*

PRC Mem. 35.  PCA Integrity never responds to this point at all, instead contending that the very

invocation of the Small Business Administration is a red herring.  Opp'n to Alorica/GRSI,

Uniquity, and PRC 25.

The Court disagrees with Relator's stance and finds this reference to the Federal Register

illuminating.[30]  It seems unlikely that the government lacked actual knowledge of fraudulent

misrepresentations in all 137 of the instances that the Small Business Administration references.

And if the government has regularly proceeded in normal business relations with companies that

made misrepresentations under the same statutory provision that Relator invokes here to

establish the liability of the subcontractor and allegedly-affiliated defendants, then there is no

reason to believe that it would have modified its business relations with PRC (or the other

Defendants) under that same provision.  In fact, there is no evidence that ED has done anything

with respect to the allegations in this case since they were first raised in 2015.[31]  Thus, because

Relator has failed to address this point or to provide other factual allegations that specifically

pertain to either Defendant PRC or to any of the other Defendants, it has failed to establish

materiality here.

Given this failure to establish materiality and the pleading deficiencies identified

previously, the Court concludes that Relator has not made out a claim for relief that satisfies

---

[30] The Court takes judicial notice of the Federal Register as a publicly-available document.  *See* Fed. R. Evid. 201(b).

[31] Although Relator correctly indicates that there are many reasons that the Department of Justice may or may not decide to pursue a *qui tam* suit, the allegations raised herein were investigated, in part, by the Department of Education Office of General Counsel (a fact of which Relator's counsel is well aware, given his intimate involvement in the government's investigation).  There is no indication that ED has taken any action, contractually, administratively, or otherwise, as a result of the investigation.

Rule 12(b)(6) and Rule 9(b) for any of the Defendants with respect to its presentment and false statement claims (Count I and Count II).[32]

### D. Reverse False Claim

As previously mentioned, in addition to its presentment and false statement claims, Relator alleges that the named Defendants, as well as the John Doe Defendants, violated another provision of the False Claims Act: the "reverse" false claims provision, codified as amended at 31 U.S.C. § 3729(a)(1)(G). Drawing on all the factual allegations in its pleading, Relator contends that "Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government." Am. Compl. ¶ 337. PCA Integrity alleges that, "[s]pecifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew the records or statements were false."[33] *Id.* According to Relator, because "the Amended Complaint specifically alleges facts that identify Defendants' obligation to pay various penalties arising from both federal and SBA regulations," Opp'n to ConServe, Protocol, and State 41; Opp'n to Pioneer, Edgewater, and Bass 35; Opp'n to Alorica/GRSI, Uniquity, and PRC 42, and because the expanded definition of "obligation" under the post-FERA amendments to the reverse claims provision sweeps in Defendants' conduct, Opp'n to ConServe, Protocol, and State 42; Opp'n to Pioneer, Edgewater, and Bass 35; Opp'n to Alorica/GRSI, Uniquity, and

---

[32] Again, because of the fact-bound nature of the demanding materiality inquiry, *cf. Universal Health Services*, 136 S. Ct. at 2004 n.6, the Court's analysis has focused on Uniquity and PRC to highlight concrete examples of the materiality deficiencies that plague Relator's pleading without filling pages with additional extremely similar descriptions of problems.

[33] The Court is uncertain as to the antecedent for "it" in this sentence, since the preceding noun is "Defendants" and Relator does not indicate which facts pertain to which Defendant(s) in support of this claim.

PRC 42, Defendants are also liable under this provision of the FCA.[34]  The core point is that,

under this theory of liability, Defendants have an "obligation to pay the government" that "arises

from contractual, statutory, and regulatory requirements," Opp'n to ConServe, Protocol, and

State 41; Opp'n to Pioneer, Edgewater, and Bass 34; Opp'n to Alorica/GRSI, Uniquity, and PRC

41, even if those obligations involve the same alleged misrepresentations and/or other fraudulent

conduct that Relator alleges amount to violations of the 31 U.S.C. § 3729(a)(1)(A) and (B).

Defendants argue that, notwithstanding PCA's purported specificity, Relator has failed to

allege any facts that support the elements of this claim.  The crux of Defendants' argument is that

the same conduct that creates liability under the other provisions of the FCA cannot also create

an actionable obligation under the reverse false claims provision.  *See* ConServe Mem. 42

("Relator has failed to identify any specific obligation by ConServe to pay the government.");

Protocol Mem. 30 ("The Amended Complaint [f]ails [t]o [a]llege [a]ny [o]bligation to [p]ay the

[g]overnment in [s]upport of its [t]hreadbare [r]everse FCA [c]laim."); State Mem. 32 (arguing

that Relator has failed "to state, with particularity or otherwise, any facts that would impose

liability for a reverse false claim"); Pioneer Mem. 35 ("Relator alleges no facts indicating that

Pioneer had a payment obligation to the U.S. Government, let alone that Pioneer somehow

fraudulently avoided such an obligation."); Edgewater Mem. 20 (noting lack of factual

_____

[34] Relator's Count IV contends that, to the extent wrongdoing occurred prior to May 20,
2009, th[e] Amended Complaint should be deemed to include violations of the "pre-FERA FCA,
*e.g.*, 31 U.S.C. § 3729(a)(7) (2006)."  Am. Compl. 86 n.11.  However, Relator's opposition
offers no arguments whatsoever to explain how the alleged facts are actionable under the pre-
FERA version of the reverse false claims provision, nor does Relator at any point challenge the
fact that Defendants appear to address the post-FERA version of this provision.  *See, e.g.*,
Alorica/GRSI Mem. 23 (explicitly referencing only post-FERA version of claim).  Thus,
following the parties' lead in their briefings, the Court assumes *arguendo* that only the post-
FERA version of the statute is salient in considering the alleged conduct.  In any event, because
this amended provision sweeps in more conduct, if the allegations fail under this standard, they
would also fall short under the earlier standard.

allegations concerning Edgewater and stating that "money obtained by the defendants fraudulently," in violation of another FCA provision, cannot form basis of obligation for reverse false claim action); Bass Mem. 13 ("[T]here is no allegation that Bass owed money to the government."); Alorica/GRSI Mem. 23 ("The [r]everse FCA [c]laim [l]acks [r]equired [p]articularity."); PRC Mem. 9 ("Relator offers no facts supporting a § 3729(a)(1)(G) claim, i.e. Count IV (the 'reverse false claim').").  For the following reasons, the Court grants Defendants' motions to dismiss this claim.

A reverse false claim is one that "results in no payment to the government when a payment is obligated."  *Hoyte v. Am. Nat'l Red Cross,* 518 F.3d 61, 63 n.1 (D.C. Cir. 2008) (quoting *United States ex rel. Bain v. Ga. Gulf Corp.,* 386 F.3d 648, 653 (5th Cir. 2004)).  The key issue here, and in many FCA suits under this provision, is what constitutes an "obligation." As previously noted, the post-FERA version of the reverse false claims action expands its reach by, *inter alia*, adding an explicit definition of the term "to address what Congress saw as the overly narrow interpretation of the word 'obligation' that some courts had adopted," *Si II*, 71 F. Supp. 3d at 89 (citing S. Rep. No. 111-10, at 13–15).  The FCA, as amended, defines obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

Here, Defendants' arguments appear at first glance to be about a lack of specificity in Relator's pleading.  Digging deeper, however, the contention that Relator does not present any specific obligation that amounts to an established duty to make a payment to the government stems from a more fundamental underlying premise: the same alleged misrepresentations (alleged material breach of the subcontracting plan, incorporated as material terms of contracts

with ED, and alleged false or misleading self-certifications in violation of controlling statutes

and regulations) cannot be the source of an actionable obligation under the statute.  There is no

binding precedent addressing whether alleged breaches of contractual obligations such as those

at issue here give rise to post-FERA reverse false claim liability.[35]  However, the Court looks for

guidance to the dispositions of a number of district courts in this circuit, all of which have

distinguished between conduct giving rise to obligations that are actionable under this provision

and the concealment of information that may be separately actionable under to the FCA's

presentment and false claim provisions.  These courts have "determined that [a] reverse false

claim may not rest . . . on the argument 'that an obligation arose out of [the d]efendants'

concealment of their allegedly fraudulent activity,' because 'by this logic, just about any

traditional false statement or presentment action would give rise to a reverse false claim action;

after all, presumably any false statement actionable under sections 3729(a)(1)(A) or

3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained

money.'"  *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82–

83 (D.D.C. 2018) (quoting *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F.

Supp. 3d 13, 32 (D.D.C. 2017), *amended on reconsideration in part,* 296 F. Supp. 3d 155

(D.D.C. 2017)); *see also United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 41 (D.D.C.

2016); *Si II*, 71 F. Supp. 3d at 97; *United States ex rel. Scott v. Pac. Architects & Engineers

(PAE), Inc.*, 270 F. Supp. 3d 146, 155 (D.D.C. 2017); *United States v. Newman*, No. CV 16-1169

(CKK), 2017 WL 3575848, at *9 (D.D.C. Aug. 17, 2017).  The Court finds these constructions,

---

[35] As the *Landis* court noted in construing the pre-FERA reverse false claims action, "[t]he D.C. Circuit has not addressed whether an alleged breach of contract constitutes an 'obligation' to pay money to the government under the FCA reverse false claims provision." 51 F. Supp. 3d at 56 (citing *Hoyte*, 518 F.3d at 69 n.6).  The Circuit has not addressed this issue post-FERA, either.

which are grounded in the logical interaction between different FCA causes of action, compelling. Relator's brief mentions no contradictory authority, nor does PCA Integrity in fact cite to any legal authority in support of its contrary position.

What the Court is left with is the plain text of the amended complaint and Relator's conclusory legal assertions. This is not enough. Even construed in the light most favorable to it, PCA Integrity's pleading contains no factual allegations of specific obligations owed by Defendants that are distinct from the same allegations of concealment involved in the other claims. Relator's opposing argument conflates two issues: whether an alleged breach of contractual agreements and alleged misrepresentations in self-certifications might create statutory or regulatory penalties, and whether there is an independent obligation to pay the government. *See* Opp'n to ConServe, Protocol, and State 42; Opp'n to Pioneer, Edgewater, and Bass 35; Opp'n to Alorica/GRSI, Uniquity, and PRC 42 (alleging that Defendants have a clear "obligation to pay various penalties arising from both federal statute and SBA regulations"). Apart from these allegations that penalties for statutory and regulatory violations are owed, no other affirmative obligation to pay the government is indicated. Nor does Relator offer any indication that the government has already assessed any penalties. Without more, however, there is not enough to establish that Defendants have an obligation for an unassessed, contingent regulatory penalty, even under the more expansive post-FERA FCA. *Accord United States ex rel. Simoneaux v. E.I. DuPont De Nemours & Co.*, 843 F.3d 1033, 1039 (5th Cir. 2016) ("[U]nassessed regulatory penalties are not obligations under the FCA. . . . [W]here, as in this case, a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay."); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 53 (D.D.C. 2017) ("An unassessed, contingent penalty

is not an FCA 'obligation' subject to suit under the reverse false claims provision."), *aff'd,* 929 F.3d 721 (D.C. Cir. 2019); *cf. United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017) (concluding that the term "obligation" under the post-FERA FCA "does *not* include a duty that is dependent on a future discretionary act").

The situation at hand is easily distinguishable, moreover from cases that have found a plausible claim for reverse false claim liability. For instance, in *Morsell*, this Court was able to specify a particular obligation such as the defendant's "knowing[] fail[ure] to adjust the Contract's pricing terms [for pricing with the government] as required by the Price Reduction Clause." 130 F. Supp. 3d at 125. Unlike the company in *Morsell*, which was contractually bound to follow controlling regulations by "notify[ing] the Government of any price reduction as soon as possible, but not later than 15 calendar days after its effective date" and "modifying the contract to reflect any price reduction which becomes applicable," *id.* at 114 (internal quotation marks and citations removed), Relator states no contractual or regulatory obligation that involves a legally-required price reduction.

Accordingly, on the facts alleged, Relator has failed to plead the elements required to make out a reverse false claim for any of the Defendants.[36]

### E. Conspiracy Claim

The remaining count in PCA Integrity's pleading, Count III, brings a conspiracy charge, again incorporating by reference all facts in the amended complaint and alleging that "Defendants knowingly conspired, and may still be conspiring . . . to commit acts in violation of

---

[36] Moreover, even if the Court accepted Relator's theory and concluded that the same predicate concealment that allegedly creates liability under other statutory provisions was itself enough to give rise to possible liability here, these claims themselves suffer from the deficiencies identified previously, all of which would recur with equal force in this context.

31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B)."[37]  Am. Compl. ¶

334.  For the reasons set forth below, Relator fails to make out a claim for relief on this count.

First, civil conspiracy fundamentals provide grounds for dismissing this action.  Although

the FCA does not define a conspiracy, courts have routinely applied civil conspiracy principles

to FCA conspiracy actions.  *See, e.g.*, *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 50

(D.D.C. 2011); *Westrick,* 685 F. Supp. 2d at 140; *United States ex rel. Durcholz v. FKW Inc.,* 189

F.3d 542, 545 n.3 (7th Cir. 1999) (citing *United States v. Murphy,* 937 F.2d 1032, 1039 (6th Cir.

1991)).  For claims of civil conspiracy, there can be no liability for a conspiracy unless there is

an independently actionable ground for liability, *Si II,* 71 F. Supp. 3d at 98, whether that sounds

in tort law, *see Halberstam,* 705 F.2d at 477 (underlying tortious act is required to give rise to

civil conspiracy liability), or in the text of a statute, *see Amin,* 26 F. Supp. 2d at 165 (no

conspiracy where alleged activities consisted of entirely lawful pursuits).  Because FCA liability

attaches to "the claim for payment," *Totten II*, 286 F.3d at 551, there can by definition be no

ground for FCA liability unless Relator establishes the submission of an actionably false claim.

For the reasons detailed above, Relator has not pled facts that suffice to establish an underlying

false claim in this suit.  Thus, Relator cannot raise a stand-alone conspiracy claim.

Moreover, as Defendants argue, the factual allegations in the pleading do not clear Rule

9(b)'s heightened pleading standard.  *See, e.g.*, ConServe Mem. 4, 11 (challenging nebulous,

imprecise nature of pleading and failure to identify any specific agreement involving ConServe);

State Mem. 34–35 (attacking complaint's failure to provide any facts that indicate a specific

agreement between State and "any other Defendant to submit false claims or false statements to

---

[37] Thus, to make the implicit, explicit, Count III alleges a conspiracy to violate both the pre- and post-FERA versions of the FCA's presentment and false statement provisions, but does not allege a conspiracy to violate the FCA's reverse false claims provision.

the government"); Pioneer Mem. 34 ("The Amended Complaint does not specify who were the members of the alleged conspiracy" or "any facts as to the time, place, or nature of an alleged conspiratorial agreement."); Edgewater Mem. 20 ("[T]here is *no* identification of a single factual averment that Edgewater actually entered into any . . . agreement [to further the alleged fraud] with *any* of the other 10 defendants."); Bass Mot. 12 ("Relator does not specify any facts as to the time, place or nature of an alleged conspiratorial agreement."); Alorica/GRSI Mem. 22 (contending that conspiracy count lacks any suggestion that WAM joined any agreement, "much less the specific details (time, place, content, and the individuals involved) required by Rule 9(b)"); PRC Mem. 8 ("The 'who, what, where, when' is not clearly stated as required by the pleading standard.").  This standard applies with equal force to an FCA conspiracy claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (discussing *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008), which applied, in context of jurisdictional analysis, Rule 9(b) pleading requirements to RICO conspiracy action); *Toyobo*, 811 F. Supp. 2d at 51 (applying Rule 9(b) to FCA conspiracy claim).  To see why, consider the third element of this claim, which requires Relator to establish that "'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'"  *Si II*, 71 F. Supp. 3d at 89 (quoting *Miller,* 608 F.3d at 899).

Here, assuming *arguendo* that Relator alleges three discrete conspiracies, each of which involves the identified prime contractor, subcontractor, and allegedly-affiliated third party within each of the three groups, Relator's complaint contains insufficient particularity with respect to each of the conspiracies.  Apart from vague references to a "shared" "conspiratorial objective to deceive" the U.S. about Defendants' and co-conspirators' "affiliated relationships with one another, and with other parties," Am Compl. ¶ 300, which occurred "from at least 2011 to the

present," *id.* ¶ 302, Relator provides no factual allegations that indicate what the "overt acts" were, when they occurred, or how they were "knowingly committed . . . in furtherance of the object of the conspiracy." *Si II*, 71 F. Supp. 3d at 89 (quoting *Miller,* 608 F.3d at 899). What, specifically, did each of the parties purportedly agree to do, and when did they make this agreement (e.g., how there could be an agreement to fraudulently induce a contract when the alleged co-conspirator did not yet exist)? When and how, specifically, did at least one co-conspirator knowingly commit at least one overt act in furtherance of this agreement? Relator never says. But without saying more, with particularity, PCA Integrity has failed to discharge its pleading burden. Thus, the Court dismisses this count.

## F. The Public Disclosure Bar

One final substantive issue remains: whether Relator may pursue this *qui tam* action, or whether, as Defendants argue, the FCA's public disclosure bar coupled with the inability to confirm Relator's claimed "original source" status makes the action improper. *See* ConServe Mem. 39–42; Protocol Mem. 32–33; State Mem. 36–38; Pioneer Mot. 32–33. Relator asserts that the public disclosure bar is inapplicable here for two reasons: First, Defendants have failed to establish that there has been a public disclosure of the allegations underlying the complaint in the manner that the FCA and this Circuit's law require. Opp'n to ConServe, Protocol, State 46–47; Opp'n to Pioneer, Edgewater, and Bass 25. Second, according to Relator, even if the material had been publicly disclosed, PCA Integrity qualifies as an original source of the information and the bar does not apply. Opp'n to ConServe, Protocol, State 48–49; Opp'n to

Pioneer, Edgewater, Bass 26–27.  For the following reasons, the Court declines to dismiss the suit on public disclosure bar grounds.[38]

Under this Circuit's controlling law, there has been a public disclosure in the FCA context if the essential elements of the allegation of fraud are revealed, "from which readers or listeners may infer . . . the conclusion that fraud has been committed."  *Springfield Terminal*, 14 F.3d at 654.  Where there has been such a public disclosure, this statutory bar "prevents suits by those other than an 'original source'" if "the government already has enough information to

---

[38] Without ignoring the 2010 amendments that made the FCA's public disclosure bar non-jurisdictional, the Court assumes *arguendo* that the public disclosure bar is jurisdictional as it applies to this law suit.  Before the relevant amendment, the public disclosure bar was considered jurisdictional based on the plain text of the statute.  *See* 31 U.S.C. § 3730(e)(4)(A) (2009) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions."); *see also United States ex rel. Shea v. Verizon Commc'ns, Inc.* (*Shea I*), 160 F. Supp. 3d 16, 24–25 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship* (*Shea II*), 863 F.3d 923 (D.C. Cir. 2017) (quoting 31 U.S.C. § 3730(e)(4)(A); *U.S. ex rel. Oliver v. Philip Morris USA Inc.* (*Oliver*)*,* 763 F.3d 36, 38 n.2 (D.C. Cir. 2014)).  The post-amendment statutory language, in notable contrast, eliminates this jurisdictional language.  *See* 31 U.S.C. § 3730(e)(4)(A) (2010) ("The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed.").  "Thus, when the amended version of § 3730(e)(4)(A) applies, public disclosure does not deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his claim."  *Shea I*, 160 F. Supp. 3d at 24 (citing *Heath,* 791 F.3d at 120; *Avocados Plus Inc. v. Veneman,* 370 F.3d 1243, 1249 (D.C. Cir. 2004)).  Notwithstanding some signals that the "amendments do not apply to pending suits filed before their enactment," *Oliver*, 763 F.3d at 38 n.2, at least one district court has engaged in a detailed analysis of retroactivity principles and concluded that "it is the date of Defendants' allegedly fraudulent conduct—not the date when litigation is filed—that governs which" version of the public disclosure bar a court is to apply, *Shea I*, 160 F. Supp. 3d at 24 (citing *United States ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 512–13 (D.C. Cir. 2007); *United States ex rel. Lujan v. Hughes Aircraft Co.,* 162 F.3d 1027, 1031 (9th Cir. 1998)).  Here, as noted previously, there is a great deal of ambiguity concerning the alleged timing of certain critical events.  In the face of this ambiguity, the Court assumes without deciding that the amendment refers to the date of the alleged conduct, making the public disclosure bar jurisdictional for at least some of the allegations in this suit.  In any event, if this is not the proper construction, then, because the suit was filed after the operative date of the 2010 amendments on March 20, 2010, the public disclosure bar is non-jurisdictional; if so, then it is an element of the cause of action, and there are independent non-jurisdictional grounds on which to dismiss Relator's claims.

investigate the case" and to decide whether or not to prosecute, or "the information could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  *Oliver*, 826 F.3d at 472; *see also Staples*, 773 F.3d at 88 (quoting *Springfield Terminal*, 14 F.3d at 654–55).  To qualify as an original source, the plaintiff-relator must either (1) "ha[ve] voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," prior to a "public disclosure" as defined by the statute, or (2) "ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" that have been "voluntarily provided the information to the Government before filing an action" under the FCA's *qui tam* provision.  31 U.S.C. § 3730(e)(4)(B).

Here, Defendants contend both that the public disclosure bar applies, and that Relator cannot properly claim original source status.  On Defendants' account, the public disclosure bar applies because the Small Business Administration was on notice of a potential affiliation between, at a minimum, the parties in the ConServe, Protocol, and State cluster several years before Relator filed this suit.  *See* ConServe Mem. 39–41; Protocol Mem. 32; State Mem. 37. Assuming without deciding that this notice amounts to a public disclosure of the same issues presented here, the Court nonetheless finds it premature to dismiss Relator's claims on the basis that PCA Integrity lacks original source status.[39]  Defendants contend that Relator cannot

_____

[39] It bears repeating that the Court reserves judgment on the question of whether there was a public disclosure in this case.  This Circuit's controlling law, as previously mentioned, sets forth a clear test for public disclosure: "if X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed."  *Springfield Terminal*, 14 F.3d at 654 (emphasis in original).  Thus, "a qui tam action cannot be sustained where both elements of the fraudulent transaction—X and Y—are already public, even if the relator 'comes forward with additional evidence incriminating the defendant.'"  *Staples*, 773 F.3d at 86 (quoting *Springfield Terminal*, 14 F.3d at 655).  Based only on the facts alleged in Relator's pleading, the Court is not certain

possibly be an original source "because it was not formed as a legal entity until May 20, 2015—two years after the public disclosure to the [Small Business Administration]." ConServe Mem. 41. But taking the facts in the complaint to be true, as the Court must in deciding a 12(b)(6) motion to dismiss, Defendants' argument falls flat. The uncontroverted facts indicate that Relator consists of "participants in the PCA initiative" with "direct knowledge of the conduct alleged." Compl. ¶ 29. Defendants do not present any further factual assertions or legal argumentation to explain why the Court should discredit PCA Integrity's claims that it "conducted an independent investigation to uncover false claims." *Id.* On the record before the Court, Relator may have voluntarily provided the government with information "independent of," and which "materially add[ed] to[,] the publicly disclosed allegations or transactions" before filing the instant *qui tam* action, 31 U.S.C. § 3730(e)(4)(B). Because such conduct could qualify PCA Integrity for original source status, and because Defendants do not present a compelling reason that this statutory provision does not cover Relator's conduct here, the Court declines to dismiss the suit on public disclosure bar grounds. Instead, the Court resolves the issues before it on the non-jurisdictional issue of failure to establish a claim for relief as required by Rules 12(b)(6) and 9(b)[40] and grants Defendants' motions to dismiss Relator's claims for the reasons previously explained.[41]

---

whether "the combination of X and Y" was revealed, thereby creating a public disclosure prior to Relator's alleged presentation of information to the government.

[40] Again, the Court reserves judgment on whether the public disclosure bar is jurisdictional in this suit given considerable ambiguity concerning the dates of operative events. The Court need not confirm jurisdiction to rule on other grounds because the "requirement to confirm jurisdiction at the outset controls 'only when the existence of *Article III* jurisdiction is in doubt,' such that the court may leave an issue of *statutory*—as opposed to Article III—jurisdiction undecided while proceeding to consider a non[-]jurisdictional ground." *Shea I*, 748 F.3d at 346 (Srinivansan, J., concurring) (emphasis in original) (quoting *Chalabi v. Hashemite Kingdom of Jordan,* 543 F.3d 725, 728 (D.C. Cir. 2008)). And when it comes to the FCA, even

## G. Dismissal Without Prejudice

One procedural matter remains: whether dismissal of Relator's claims should be with or without prejudice. Defendants ConServe, Protocol, State, Pioneer, Edgewater, Bass, and Alorica/GRSI seek dismissal with prejudice. *See* ConServe Mem. 19; Protocol Mem. 38; State Mem. 40; Edgewater Proposed Order 1, ECF No. 87-1; Bass Proposed Order 1, ECF No. 85-1; Alorica/GRSI Mem. 43. Relator seeks leave to amend any pleading deficiencies. Opp'n to ConServe, Protocol, and State 55; Opp'n to Pioneer, Edgewater, and Bass 35; Opp'n to GRSI/Alorica, Uniquity, and PRC 42. For the following reasons, the Court will dismiss the claims without prejudice.[42]

---

the earlier version of "the public-disclosure bar at most established a statutory jurisdictional limitation, not an Article III limitation." *Id.*

    In addition, until such time, if ever, that Relator amends its pleading to clarify where and when the alleged conduct giving rise to liability occurred, the Court reserves judgment concerning personal jurisdiction, which ConServe, Protocol, and State challenge, and venue, which Protocol and State challenge, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), respectively. Defendants may reassert their original arguments in response to any future pleading. However, if Relator decides to amend its complaint, it should note that the Court believes that the allegations of personal jurisdiction are thin.

[41] One final matter remains pending: the two motions for judicial notice by ConServe, ECF No. 92, and Relator, ECF No. 98 respectively. ConServe filed an unopposed motion for the Court to take judicial notice of a decisions by the Small Business Administration, Relator's date of formation, and information concerning Protocol's certifications on sam.gov. *See* ECF No. 92. Relator requests that the Court consider certification statements filed by Defendant Uniquity between 2013–2015, ECF No. 98, which Defendant Uniquity contests on the grounds that the allegations against it lodged in the amended complaint end in 2013, ECF No. 108. Because the Court resolves the issues in the manner previously detailed, these motions are denied as moot. Relator may include allegations concerning these matters in an amended complaint and Defendants may re-raise the same arguments for dismissal, to the extent applicable, in any future response to any such amended complaint. *See Si I*, No. CIV.A. 09-2388 KBJ, 2013 WL 4478953, at *2 (D.D.C. Aug. 21, 2013) (permitting defendants to re-present same arguments after finding that relator's complaint did not satisfy Rule 9(b) pleading standard).

[42] Defendant Protocol has sought dismissal without prejudice on an additional ground not previously discussed: improper service of process. Protocol Mem. 36–37 (alleging untimely service in violation of Federal Rules of Civil Procedure Rule 4(m) and 12(b)(5) and seeking

In this case, the Court dismisses Relator's FCA claims due to the failure to satisfy pleading standards. "Ordinarily, a plaintiff may overcome the failure to satisfy pleading standards by amending her complaint." *Shea I*, 160 F. Supp. 3d at 31 (citing *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996)). More specifically, under this Circuit's controlling law, "failure to plead fraud with particularity"—the basis on which this Court grants Defendants' motions—"does not support a dismissal with prejudice. To the contrary, leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud." *Firestone*, 76 F.3d at 1209 (quoting *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986)). Only if the trial court "determines that 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency'" is dismissal with prejudice appropriate. *Id.* (quoting *Jarrell v. United States Postal Serv.,* 753 F.2d 1088, 1091 (D.C. Cir. 1985)). Here, because the allegation of further facts might cure the identified deficiencies (although the Court has its doubts, given the length of the investigation and Relator's counsel's central role in the investigation), the Court sees no reason to deviate from the general rule. Thus, it grants the motions to dismiss without prejudice and grants Relator leave to amend its complaint.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the parties' joint motion to dismiss claims against Defendant West Corporation (ECF No. 77); **GRANTS** Defendants' motions to dismiss (ECF Nos. 79, 81, 85, 86, 87, 88, 89, 91, and 93); **DENIES AS MOOT** Defendant ConServe's motion for judicial notice (ECF No. 92); and **DENIES AS MOOT** Relator PCA Integrity's motion for judicial notice (ECF No. 98). Relator may, within thirty days of this opinion, file an

---

dismissal without prejudice). Because the delay was short and Relator's briefs suggest good faith efforts to serve process, the Court declines to grant dismissal on this ground.

amended complaint.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  February 11, 2020                                    RUDOLPH CONTRERAS
                                                                      United States District Judge